ROWE v MONTGOMERY WARD & CO, INCORPORATED

Docket No. 84848. Argued October 2, 1990 (Calendar No. 3). Decided July 31, 1991. Dissenting opinion by Levin, J., filed August 2, 1991.

Mary Rowe brought an action in the Kent Circuit Court against Montgomery Ward & Co., Incorporated, alleging wrongful discharge and breach of a contract not to terminate her employment except for cause. The court, Roman J. Snow, J., entered judgment on a jury verdict for the plaintiff. Thereafter, the defendant's motions for judgment notwithstanding the verdict, a new trial, or remittitur were denied. The Court of Appeals, Maher, P.J., and L. F. Simmons, J. (Gribbs, J., dissenting), reversed in an unpublished opinion per curiam, finding that the plaintiff was an employee at will (Docket No. 93817). The plaintiff appeals.

In an opinion by Justice Riley, joined by Justices Brickley and Griffin, and an opinion by Justice Boyle, the Supreme Court *held:*

The plaintiff may not maintain an action for breach of contract as a result of her dismissal. Her proofs are insufficient to support her claim of a promise by the defendant, implied in fact, not to terminate her employment except for just cause.

1. Contracts for permanent employment are for indefinite periods of time and are presumed to provide employment at will unless accompanied by distinguishing features or provisions or additional consideration supporting a term of permanent employment. Termination for just cause may be provided in a contract of employment for indefinite duration by express agreement or may arise as a result of an employee's legitimate expectations grounded in an employer's policy statements. Contractual implications arising from oral statements are determined on the basis of the meaning reasonable persons might attach to the language, given the circumstances presented. Any contractual obligation for permanent employment arising from

REFERENCES

Am Jur 2d, Master and Servant §§ 32, 45.

Comment Note—Validity and duration of contract purporting to be for permanent employment. 60 ALR3d 226.

oral representations must be based on more than an expression of an optimistic hope of a long relationship, and the statements clearly must permit a construction which supports the asserted meaning. In this case, objective evidence was lacking to permit a reasonable juror to find implied in fact a promise of termination only for just cause. The employer expressed a policy in general terms with regard to termination, clearly not intending to form a contract for permanent employment. There was no evidence from which reasonable minds could deduce mutual agreement of employment terminable only for cause.

2. The defendant clearly and unambiguously gave the plaintiff reasonable notice of its policy of termination at will in its handbook, distributed in 1983, which modified any prior expectations of termination only for cause and precluded any legitimate expectation by the plaintiff of discharge only for cause. The fact that the plaintiff failed to sign employment-at-will disclaimers was not determinative.

Justice BOYLE, concurring, stated that where the parties have not supplied a term of duration, employment at will is inferred, but may be overcome by establishing that a contrary inference is more likely. Enforceable obligations arise from explicit promises, from promises implied in fact, or obligations implied in law. Where the communication between the parties has more than one possible meaning, a court will employ its own criteria for interpretation; where the contract fails to provide for a contingency, courts may fill the gaps to avoid failure for indefiniteness.

"As long as" may be interpreted either in a temporal or a qualitative sense. It may be read literally, as an obligation to provide lifetime employment, or as an offer of steady employment. Because it is susceptible of either meaning, it cannot be said that the "plain meaning" of the phrase addresses when or how termination will occur or binds the employer for any particular length of time. Where the parties have failed to set forth a material term, the court must interpret language and conduct to determine the parties' intent. In the employment context, "as long as," like "lifetime" and "permanent," are construed as offers of steady employment.

In the context of employment arrangements, a promissory theory of liability is analyzed in the light of the presumption of employment at will. Where it is asserted that the proofs are insufficient to create an issue of fact, a claim of a promise implied in fact requires the court to focus on the words or actions of the defendant to determine whether there is sufficient evidence that a reasonable promisee could believe mani-

fested an intention to make a commitment of job security. Because the defendant's commitment-making actions do not predominate, the decision of the Court of Appeals should be affirmed.

Affirmed.

Justice LEVIN, dissenting, stated that the plaintiff's claim for wrongful discharge based on an express contract does not depend on Montgomery Ward's written policy statements or on terms left to inference, but rather on Montgomery Ward's offer, subject to the Rules of Personal Conduct that enumerated grounds for discharge, to employ her to sell appliances at a stated compensation for as long as she was able to do the work. Because the promise by the employer stated a term of duration and required no performance by the plaintiff other than that she sell, she could be discharged only for a failure to sell, or for a cause stated in the Rules of Personal Conduct, or for a cause the employer might seek to establish by implication.

Contracts with "as long as" durational terms are express contracts. By its terms such a promise is not for permanent or lifetime employment, but rather for employment for a term coextensive with the time that the employee is able to do the work.

An offer by an employer to employ a person for stated compensation as long as the person is able to do the work defines clearly, specifically, and unambiguously the work to be done, the compensation to be paid, and the term of the contract, so that the trier of fact may find, upon acceptance, an express contract of employment was formed for as long as the employee is able to do the work. Because the contract provides a method for determining the length of the engagement, the duration of the contract is determinable. The duration is sufficiently definite, even though it is uncertain how long the employee will be able to do the work.

The promise to provide the employee with work at a stated compensation for as long as the employee is able to do the work is express, not implied, overcoming a presumption of employment at will.

The correct focus is not on what the promisor actually intended, but on what a reasonable promisee would conclude the offer meant. The question whether the words used by the parties are sufficient to support a finding of a contract of employment does not depend on whether the words are in writing or are expressed orally. There is no rule of law requiring objective support in the form of a manual or other writing, or other corroborative evidence for an oral term of a contract of

employment. A term of duration of an employment contract is not negated, as a matter of law, by evidence that the employee when hired did not inquire about or negotiate for job security, or by evidence that the employee was seeking a sales position rather than a singular, executive job position.

Chief Justice CAVANAGH, dissenting, stated that the relevant issue regarding the terms of the plaintiff's oral employment contract, including the durational or job security term, is what terms in fact were agreed to, not how or whether they were negotiated. To the extent that objective support for the express oral contract is relevant, such factors support the plaintiff.

The majority's newly invented requirement of objective support for an express oral employment contract from policy manuals or statements alters and misapplies the holding and reasoning in *Toussaint v Blue Cross & Blue Shield of Michigan*, 408 Mich 579 (1980), and its companion case, *Ebling*. While it is true that Toussaint was given a manual specifically providing termination only for just cause, it was not relied on to support the existence of the oral contract providing termination only for just cause, but was relevant only to his separate claim that his dismissal without cause was barred by the legitimate expectations created by the manual.

Whether two parties, by express oral statements, have entered into a contract providing termination only for just cause is a question of fact for the jury. That determination should not be disturbed unless, considering the record in the light most favorable to the verdict, there is neither competent nor sufficient evidence from which reasonable minds could reach the jury's conclusion. In this case, the oral contract enjoys sufficient factual support to justify the jury's verdict. For all relevant and dispositive purposes, this case is legally and factually indistinguishable from *Toussaint*.

Justice MALLETT took no part in the decision of this case.

MASTER AND SERVANT — EMPLOYMENT AT WILL — TERMINATION FOR CAUSE — IMPLIED CONTRACTS.

Termination for just cause may be provided in a contract of employment for indefinite duration by express agreement or may arise as a result of an employee's legitimate expectations grounded in an employer's policy statements; contractual implications arising from oral statements are to be determined on the basis of the meaning reasonable persons might attach to the language, given the circumstances presented; any contractual obligation for permanent employment arising from oral representations must be based on more than an expression of an optimistic hope of a long relationship and the statements

clearly must permit a construction which supports the asserted meaning.

*Meana, Spruit & Bedevia, P.C.* (by *Richard M. Spruit*), for the plaintiff.

*Dykema, Gossett* (by *Charles C. DeWitt, Jr.*) for the defendant.

Amici Curiae:

*Mark Granzotto, Monica Farris Linkner,* and *Charles P. Burbach* for the Michigan Trial Lawyers Association.

*Clark, Klein & Beaumont* (by *Dwight H. Vincent, J. Walker Henry,* and *Rachelle G. Silberberg*) for Michigan Manufacturers Association.

*Miller, Canfield, Paddock & Stone* (by *Diane M. Soubly*) for American Society of Employers, Motor Vehicle Manufacturers Association of the United States, Inc., Greater Detroit Chamber of Commerce, and Michigan State Chamber of Commerce.

RILEY, J. In *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579; 292 NW2d 880 (1980), this Court joined the forefront of a nationwide experiment in which, under varying theories, courts extended job security to nonunionized employees. In the vast outpouring of ensuing cases, there are indeed situations in which employers have in reality agreed to limit managerial discretion. However, the theory remains troubling because of those instances in which application of contract law is a transparent invitation to the factfinder to decide *not* what the "contract" was, but what "fairness" requires.

That courts have not been successful in unravel-

ing the logic of the theory to produce principles that distinguish the first category of cases from the second, is not necessarily a reason to abandon the experiment. As Justice GRIFFIN put it in *In re Certified Question, Bankey v Storer Broadcasting Co*, 432 Mich 438, 457; 443 NW2d 112 (1989), "[f]airness suggests that a discharge-for-cause policy announced with flourishes and fanfare at noonday should not be revoked by a pennywhistle trill at midnight." But unless the theory has some relation to the reality, calling something a contract that is in no sense a contract cannot advance respect for the law. Thus, we seek a resolution which is consistent with contract law relative to the employment setting while minimizing the possibility of abuse by either party to the employment relationship.

It is in this context that we address the question presented in this appeal: whether an employer's oral statements and written policy statements created an employment contract terminable only for cause.

### FACTS AND PROCEEDINGS

In August of 1976, plaintiff applied for a sales position at defendant's North Kent Mall store in Grand Rapids. Plaintiff was interviewed by Mr. Vern Harryman who, according to plaintiff, told her that she would have a job at Montgomery Ward & Co., Incorporated, as long as she achieved her sales quota. With regard to his meeting with plaintiff, Mr. Harryman testified:

When we hired commission salespeople, that's sort of a different type of employee than a time-card person. Their main objective, the number one thing was that they must attain their draw of a hundred and twenty-six dollars a week, and gener-

ally, as long as they generated sales and were honest, why, they had a job at Wards, and that's the way we used to hire our people.

At the time of her hiring, plaintiff signed a sheet entitled "Rules of Personal Conduct." The sheet stated that adherence to company policies would help an employee to achieve "growth, profit, security, [and a] successful career." The rules further provided that anyone involved in the following activities would be immediately dismissed.[1]

Several years later, in January of 1982, defendant issued to all employees a handbook entitled "Welcome to Wards." The handbook contained disciplinary guidelines which classified infractions according to severity, and allowed four types of discipline for transgression: "1) Written Warning(s); 2) Suspension without Pay; 3) Probation . . . ; and 4) Separation." In the back of the handbook was a form designated the "New Employee Sign-Off Sheet." The sheet provided in part:

> I have read and fully understand the rules governing my employment with Montgomery Ward. I agree to employment with Montgomery Ward under the conditions explained. I understand these conditions can be changed by the Company, without notice, at any time. I also understand and

---

[1]. Theft

• D[e]struction or misappropriation of property

• Violation of accepted moral standards

• Manipulating, altering or falsifying Company records (including employment application)

• Dishonesty of any kind

agree that my employment is for no definite period
and may, regardless of the time and manner of
payment of my wages and salary, be terminated at
any time, with or without cause, and without any
previous notice.

Although a personnel employee informed plain-
tiff that the sheet was applicable to her, plaintiff
refused to sign the form. Plaintiff claimed that it
applied only to new employees, and she did not
"feel it's right that you can fire somebody for no
reason, at all." Plaintiff noted on the back of the
sign-off sheet, "Read and do not wish to sign. 5-20-
82. [s] Mary Rowe."

Defendant issued another employee handbook to
its work force in August of 1982. The August, 1982
handbook also contained an "Employee Sign-off
Sheet" providing for termination with or without
cause. Plaintiff received but did not sign this sheet.
All Montgomery Ward employees, including plain-
tiff, received another handbook in May of 1983. In
the 1983 handbook, there was further language
providing for employment at will. Virtually the
same disciplinary guidelines were included in all
the handbooks.

The Court of Appeals opinion aptly describes the
facts surrounding plaintiff's termination.

On March 8, 1984, plaintiff was scheduled to
work from 1 p.m. to 9 p.m. At 2 p.m., she was
observed leaving the store from an unauthorized
exit by security personnel. She returned approxi-
mately four hours later. Plaintiff did not receive
permission to leave the store from her supervisor,
although she claimed that she attempted to con-
tact him several times since the previous day but
was unable. She did tell her co-workers that she
had to leave on an emergency but did not say
where she was going or how long she would be
gone. Further, even though the salaries of commis-

sioned salespersons are not de endent upon the hours worked, plaintiff failed to punch out when she left or punch in when she returned, as required by company policy. Neither did she make note of her four-hour absence on the time card which she turned in at the end of the work week.

Two days later, plaintiff was called into the office of the store manager to answer for the unauthorized absence. She allegedly gave no explanation for leaving the store and refused to provide a written statement on the matter. She said only that she could not remember where she was for those four hours. As a result of this incident, plaintiff was terminated from defendant's employ.

On May 14, 1984, plaintiff filed a complaint against defendant in the Kent Circuit Court asserting claims for wrongful discharge, breach of contract, and several other causes of action which are not relevant for purposes of this appeal. A jury trial on the matter was held on February 18 and 19, 1986. At the conclusion of plaintiff's proofs, defendant moved for a directed verdict on the ground that she was an at-will employee who was subject to dismissal at any time without cause. The court denied that motion, reasoning that an issue of fact existed for the jury to determine whether there was a just-cause employment contract or whether plaintiff's employ was terminable at the will of defendant. The trial then continued and eventually concluded in a jury verdict of $86,500 plus interest in favor of plaintiff. A judgment to that effect was thereafter entered by the court.

On May 1, 1986, defendant filed motions for judgment notwithstanding the verdict (JNOV), a new trial, or remittitur. By court order dated June 19, 1986, each of those motions was denied.[2]

Defendant appealed the decision, and the Court

---

[2] *Rowe v Montgomery Ward & Co, Inc,* unpublished opinion per curiam of the Court of Appeals, decided November 9, 1988 (Docket No. 93817), pp 2-3.

of Appeals reversed,[3] finding that plaintiff was an employee at will. Plaintiff appealed in this Court, and we ordered *Rowe* held in abeyance pending resolution of *In re Certified Question, supra,* and *Bullock v Automobile Club of Michigan,* 432 Mich 472; 444 NW2d 114 (1989). On May 2, 1990, this Court granted leave to appeal. 434 Mich 910 (1990).

I

The issue posed by this case is whether defendant employer's oral statements and written policy statements directed at plaintiff may be interpreted to permit a promise implied in fact not to terminate except for cause. We find that plaintiff's allegations are insufficient to support her contention of a promise implied in fact limiting the defendant's right to terminate her employment. Thus, plaintiff cannot maintain an action for breach of contract as a result of her dismissal.

This Court has held that contracts for permanent employment are for an indefinite period of time and are presumptively construed to provide employment at will. *Lynas v Maxwell Farms,* 279 Mich 684, 687; 273 NW 315 (1937). When contract claims rest on proofs of oral representations, the presumption provides assurance that oral contracts for an indefinite term, which fall outside the statute of frauds, will be recognized only where circumstances suggest both parties intended to be bound. The presumption may be overcome by proof of an express contract for a definite term or a provision forbidding discharge in the absence of just cause, or it may be overcome by proofs which permit a promise implied in fact of employment

---

[3] Judge GRIBBS dissented from the per curiam decision signed by Judge MAHER and Judge SIMMONS.

security, i.e., for a particular period of time or to terminate only for just cause.

In *Lynas,* the Court declined to imply a durational term where the plaintiff accepted an offer of a "permanent lifetime position with the defendant." The Court observed, however, that the presumption of employment at will can be overcome if a contract is accompanied by "distinguishing features or provisions," or additional consideration supporting a term of permanent employment.

Again, in *Toussaint v Blue Cross & Blue Shield of Michigan, supra,* p 600, the Court stated that "[b]ecause the parties began with complete freedom, the court will presume that they intended to obligate themselves to a relationship at will." In general, parties to an employment contract "remain free to provide, or not to provide, for job security." *Valentine v General American Credit, Inc,* 420 Mich 256, 258; 362 NW2d 628 (1984).

In *Toussaint,* we had the opportunity to expand on the rule in *Lynas* and explore the kinds of "distinguishing features or provisions," or special circumstances which limit an employer's right to discharge on an open-ended contract. This Court there found sufficient factual evidence to permit a jury to imply a limitation on the employer's right to discharge and held that a provision of termination for just cause may become part of a contract for indefinite duration by express agreement, or "as a result of an employee's legitimate expectations grounded in an employer's policy statements." 408 Mich 598. However, the Court was careful to limit the effect of its holding:

> Employers are most assuredly free to enter into employment contracts terminable at will without assigning cause. We hold only that an employer's express agreement to terminate *only* for cause, or statements of company policy and procedure *to*

*that effect,* can give rise to rights enforceable in contract. [408 Mich 610. Emphasis added.][4]

Plaintiff asserts that oral statements made to her at a prehiring interview amounted to a contract to terminate only for just cause, while defendant asserts that the plaintiff was an employee at will. However, this is not a situation in which interpretation requires an express determination of credibility. *McIntyre v Smith-Bridgman & Co,* 301 Mich 629; 4 NW2d 36 (1942). Rather, this is a situation in which the parties attach different meanings to undisputed facts, and the Court is asked to conclude that the jury was entitled to determine from the conduct of the parties that a promise existed limiting the employer's ability to discharge.

Again, we are asked here to decide whether an employer's oral statements and written policy statements created an employment contract terminable only for cause. We do *not* decide that the words and conduct of parties cannot, as a matter of law, create an issue submissible to a jury regarding the existence of a contract implied in fact. Moreover, we do *not* suggest that a contract of employment is too indefinite to be enforced where the employee's consideration is the work performed in response to a unilateral offer. Nor do we depart from the concept that the presumption of employment at will is a rule of construction rather than a substantive limitation. As Justice RYAN acknowledged in his dissent in *Toussaint, supra,* p 645, "[w]e have no doubt that circumstances could exist in which an employer's written policies

---

[4] In *Bullock v Automobile Club of Michigan,* and *In re Certified Question, supra,* we distinguished between a promise implied in law arising from the employer's creation of legitimate expectations and an oral contract which can be formed on the basis of an express promise of job security or a promise implied in fact.

. . . might be incorporated by reference, expressly or impliedly, into an otherwise oral employment contract and thus become a declaration of the employment agreement." It is just as true, however, that the party bearing the burden of overcoming the presumption of employment at will must convince the court either that it should supply an omitted term or that the circumstances are such that the jury should be permitted to so conclude.[5]

In determining whether a reasonable factfinder can find a promise of job security implied in fact, we look to all the facts and circumstances to evaluate the intent of the parties. As stated in *Miller v Stevens,* 224 Mich 626, 632; 195 NW 481 (1923):

> A contract is implied where the intention as to it is not manifested by direct or explicit words

---

[5] *Bullock* counsels that the presumption of employment at will does not authorize dismissal of unrebutted allegations of "exceptional circumstances." But, *Bullock* does not stand for the proposition that all such claims are submissible to a jury.

As 3 Corbin, Contracts, § 554, pp 223-225, observes, "If the words of agreement, whether oral or written, are definite and undisputed, and if there is no doubt as to the relevant surrounding circumstances, the interpretation of the words is ordinarily held to be a matter for the court."

In the 1991 supplement to § 554A, p 274, Professor Kaufman observes:

> Corbin's assertion that all questions of interpretation are essentially factual was not intended to destroy that rule. What Corbin meant was that even where a *judge* is to decide on a particular question of interpretation, he still is obliged to treat the question as one of fact. That is, he is still obliged to hold a factual hearing, he is obliged to take evidence, to allow cross-examination, to inquire into the surrounding circumstances, the situations and prior communications of the parties, and the like. [Emphasis in original.]

Where there are two fairly reasonable interpretations of the situation or where the proper interpretation of a contract requires a determination of credibility, summary disposition is inappropriate.

between the parties, but is to be gathered by
implication or proper deduction from the conduct
of the parties, language used or things done by
them, or other pertinent circumstances attending
the transaction.

In deciding whether there was mutual assent to a
just-cause provision, we use an objective test,
"looking to the expressed words of the parties *and
their visible acts.*" (Emphasis added.) *Goldman v
Century Ins Co,* 354 Mich 528, 535; 93 NW2d 240
(1958); *Stark v Kent Products, Inc,* 62 Mich App
546; 233 NW2d 643 (1975).

The starting point in analyzing oral statements
for contractual implications is to determine the
meaning that reasonable persons might have at-
tached to the language, given the circumstances
presented. In our analysis, we agree with the
federal district court in *Carpenter v American
Excelsior Co,* 650 F Supp 933, 936, n 6 (ED Mich,
1987):

> After all *Lynas* as well as reality compels recog-
> nition of the fact that neither party to the begin-
> ning of an employment relationship expects it to
> be unsatisfactory, and both hope it will have a
> significant duration. This hope and noncontractual
> wish is expressed in terms of language such as "as
> long as you do the job."

Consequently, the court stated that any orally
grounded contractual obligation for permanent
employment "must be based on *more than* an
expression of an optimistic hope of a long relation-
ship." *Id.* (Emphasis added.)

Along the same lines, Justice GRIFFIN's remarks
in *Bullock, supra* at 517, are instructive:

> Surely, a modicum of realism and common sense

is needed. An assurance such as that alleged in the instant case simply cannot be separated from the realities of the working world. It should be recognized that "lifetime" employment contracts are extraordinary and, being so, "must be expressed in clear and unequivocal terms before a court will conclude that an employer intended to enter into such a weighty obligation." [GRIFFIN, J., concurring in part and dissenting in part. Citations omitted.]

To be sure, because of the difficulty in verifying oral promises, the statements must clearly permit a construction which supports the asserted meaning. The "overreaching principle of contract interpretation" is that the court looks to all the relevant circumstances surrounding the transaction, including all writings, oral statements, and other conduct by which the parties manifested their intent. Farnsworth, Contracts, § 7.10, p 492.

We thus look to the facts in *Toussaint* to guide us in evaluating the oral statements implicated in the case before us. Both of the plaintiffs, Mr. Toussaint and Mr. Ebling, "negotiated specifically regarding job security with the persons who interviewed and hired them." 408 Mich 612. Prior to being hired, Toussaint had several interviews with the cotreasurer of the company, and the position he sought was assistant to the treasurer. Toussaint claimed he was promised he would not be terminated " 'as long as I did my job.' " Further, upon inquiring about job security, he was handed a manual which expressly confirmed that he could be released " 'for just cause only.' " *Id.* at 613.

Ebling also had several interviews prior to being hired. He was interviewed by the executive vice president and the general manager about a marketing director position. He expressed concerns specifically about job security to the vice president.

In particular, he voiced concerns about a personality conflict with his supervisor. Subsequent to negotiations, the vice president agreed not to terminate Ebling as long as he was doing his job.

In the instant case, plaintiff was interviewed for the job by Vern Harryman, sales manager of the appliance department. Although defendant had been advertising to attract salespersons, plaintiff told Harryman " 'Well, I hadn't seen the ad, I just kind of stumbled in there . . . .' " With regard to representations pertinent to job security, plaintiff testified that "[h]e said that he needed somebody to sell sewing machines and vacuum cleaners and that this job would involve selling, *and as long as I sold, I would have a job at Montgomery Ward."* (Emphasis added.)[6]

---

[6] Harryman testified:

> *Q.* At the interview, who was present other than you and Mary Rowe?
> *A.* If I remember right, and that's very difficult, I think the personnel manager introduced me, and we did most of the interview, I think, in her office. . . .

Harryman discussed with plaintiff the terms of her employment:

> *A.* . . . Their main objective, the number one thing was that they must attain their draw of a hundred and twenty-six dollars a week, and generally, as long as they generated sales and were honest, why, they had a job at Wards, and that's the way we used to hire our people.
> *Q.* What did you tell Mary Rowe when you hired her?
> *A.* That that was the prime purpose, to get sales and to attain that roughly $2,000 a week or more in sales.

In further discussing the conditions of employment, Harryman stated:

> *A.* The conditions, again, number one was to attain those sales quotas and to be honest. . . . We had those sorts of things, but again, about the only way that you could be terminated would be if you failed to make your draw for two months in a row. . . .
> *Q.* Did you tell her any other reasons for which she may be terminated?

Contrasting the surrounding circumstances of this case with *Toussaint* and *Ebling* to determine if there was mutual assent on a provision for permanent employment, or if the statements were noncontractual expressions of "optimistic hope of a long relationship," we find the oral statements insufficient to rise to the level of an agreement providing termination only for just cause. Although the "as long as" statement bears resemblance to remarks made in *Toussaint*, we find objective evidence lacking to permit a reasonable juror to find that a reasonable promisee would interpret Harryman's statements and actions as a promise of termination only for cause implied in fact.

Unlike *Toussaint*, plaintiff did not engage in preemployment negotiations regarding security. She simply "stumbled" into the store one day and had one interview before being hired. Nor is there any testimony suggesting that plaintiff inquired about job security. Therefore, Harryman's statements could not have been addressed to any inquiry regarding job security. In short, no objective evidence exists that their minds met on the subject of continued employment. In addition, we note that in *Toussaint*, the plaintiffs were applying for singular, executive job positions. That the positions were unique supports the finding that the terms were specifically negotiated. Here, plaintiff was one of many departmental salespersons. The fact that plaintiff applied for one of several identical positions militates against the likelihood that the contract terms were negotiable and suggests that company policy was more likely to govern.

Furthermore, in *Toussaint*, in response to in-

A. Theft or, you know, obviously, murder, or something like that; theft of any company properties, or so on.

quiries about job security, Toussaint was given a manual specifically providing termination only for just cause, and containing extensive disciplinary classifications. The manual offered objective support for the oral representations made to the plaintiff. In the instant case, the objective support was lacking. Upon being hired, plaintiff signed a "Rules of Personal Conduct" sheet. The sheet did not contain elaborate disciplinary procedures and, more importantly, did not contain the "release for just cause only" language. Moreover, the signed sheet conflicts with plaintiff's interpretation of the oral remarks that she would have a job as long as she achieved her sales quota, and undercuts any belief that a contract arose from the interview. The rules listed conduct such as theft, destruction of property, falsification of records, and moral impropriety which would result in immediate dismissal. Plaintiff's agreement to abide by those rules suggests that any subjective belief she maintained that she could only be dismissed for failure to obtain her quota was not reasonable.

Lastly, we find that Harryman's testimony was insufficient to support an agreement of termination only for just cause. As suggested by our holding in *Lynas, supra,* and supported by this Court's treatment of the facts in *Toussaint* and *Ebling,* an employee who seeks to establish from conduct a promise implied in fact must meet a higher standard than an employee who relies on express language. Logic compels the conclusion that where parties expressly negotiate with offers and counteroffers, it is more reasonable to anticipate mutual assent. Conversely, there is less chance that the parties desired or intended the result prayed for where, as here, conduct and oral statements are claimed to create a promise of job security implied in fact. See *DiBonaventura v*

*Consolidated Rail Corp,* 372 Pa Super 420; 539 A2d 865 (1988).

Thus, we conclude that the oral statements of job security must be clear and unequivocal to overcome the presumption of employment at will. As stated by Justice RYAN in his separate opinion in *Toussaint, supra* at 632-633:

> The second exception to the general rule consists of those instances in which the employment agreement includes some "distinguishing feature[s] or provision[s]," as the Court put it in *Lynas, supra,* so as to preclude a construction of employment at will. A classic example of this type modification of an indefinite hiring is the modern collective bargaining agreement in which there is often included a provision that an employee shall be discharged only for cause. Provisions of this nature clearly and forcefully indicate a mutual intention to limit the employer's discretion in terminating the employment relationship.

Harryman's words were couched in general terms, more akin to stating a policy as opposed to offering an express contract. His words were vague when discussing termination (e.g., "*generally,* as long as *they* generated sales and were honest . . . *they* had a job at Wards"; "*about* the only way that you could be terminated would be if you failed to make your draw . . . ."). (Emphasis added.) We find that these words do not clearly indicate an intent to form a contract for permanent employment. Rather, the context of Harryman's comments suggests that they were merely intended to emphasize the number one priority of plaintiff's job—sales.

We also reject plaintiff's contention that the "Rules of Personal Conduct" created a contract to terminate only for cause. In signing the sheet,

plaintiff agreed that she would be dismissed if she engaged in the prohibited conduct. Nothing in the rules suggested that the enumerated conduct was the only basis for dismissal, and the rules were consistent with a termination-at-will policy. Thus, we find no evidence from which a reasonable promisee could find a promise of job security. Consequently, we find no evidence from which reasonable minds could find that there was mutual assent on a term of employment terminable only for cause.

II

'Having concluded that the employer's oral statements and the "Rules of Personal Conduct" did not form contracts for permanent employment, we must next decide whether the disciplinary guidelines promulgated by defendant gave rise to an employment contract providing termination only for just cause where defendant concurrently issued sign-off sheets containing an employment-at-will policy. We find that plaintiff cannot maintain an action for breach of contract on the basis of the disciplinary guidelines because the last handbook which plaintiff received clearly set forth an employment-at-will policy.

In *Toussaint,* this Court held that an employer's written policy statements announcing a policy of termination only for cause may create contract rights if the statements give rise to "legitimate expectations" of just-cause employment in the employee. In that case, the Court determined a jury question was presented regarding whether a policy manual created such expectations. The Court stated:

Since Blue Cross published and distributed a

260-page manual establishing elaborate procedures promising "[t]o provide for the administration of fair, consistent and reasonable corrective discipline" and "to treat employees leaving Blue Cross in a fair and consistent manner and to release employees *for just cause only,*" its employees could justifiably rely on those expressions and conduct themselves accordingly. [408 Mich 617. Emphasis added.]

Referring to the just-cause provision, the Court stated:

There were, thus, on this separate basis alone, special circumstances sufficient to overcome the presumptive construction that the contract was terminable at will. [408 Mich 614.]

In *In re Certified Question, supra,* the Sixth Circuit Court of Appeals certified the following question to this Court:

"Once a provision that an employee shall not be discharged except for cause becomes legally enforceable under *Toussaint* [*supra*], as a result of an employee's legitimate expectations grounded in the employer's written policy statements, may the employer thereafter unilaterally change those written policy statements by adopting a generally applicable policy and alter the employment relationship of existing employees to one at the will of the employer in the absence of an express notification to the employees from the outset that the employer reserves the right to make such a change?" [432 Mich 441.]

In responding to the certified question, this Court held that a company's written policy statements, which created legitimate expectations in the employee of discharge for cause only, could be unilat-

erally modified by the employer. The Court stated
that

> [a]n employer may, without an express reservation
> of the right to do so, unilaterally change its writ-
> ten policy from one of discharge for cause to one of
> termination at will, provided that the employer
> gives affected employees reasonable notice of the
> policy change. [432 Mich 441.]

The Court also required that the notice be uni-
formly given to employees affected by the policy
change.

Much of the same documentation as in the case
before us was involved in *Dell v Montgomery
Ward & Co, Inc,* 811 F2d 970, 972 (CA 6, 1987). In
*Dell,* the plaintiff sued for breach of contract after
he was terminated by the defendant. The plaintiff
alleged a contract terminable only for cause arose
out of the defendant's Progressive Discipline Refer-
ence Guide (PDRG). The PDRG was designed to give
supervisors a procedure to follow when punishing
employees. However, within the PDRG, it was
stated that "[t]his procedure does not form an
employment contract." (Emphasis deleted.) Also,
the defendant's Human Resources Policy Manual
contained a provision that discharge could be with
or without cause, and also that discipline proce-
dures did not constitute employment contracts.
Furthermore, the plaintiff signed a sheet in 1982
which stated that employment could be terminated
with or without cause. Writing for the court,
Judge Ryan determined that there was no contract
making employment terminable only for cause:

> It is difficult to imagine what more the defen-
> dant might have done to make it crystal clear to
> Dell, and all Montgomery Ward employees, that,
> unless some other arrangement were made di-

rectly with the President and Chief Executive
Officer or Executive Vice President of Human
Resources, Montgomery Ward employees are em-
ployees "at will" who may be discharged with or
without cause.

. . . The unequivocal language in the "sign off
sheet" in this case, which stated that the employ-
ees could be discharged "with or without cause
and without any previous notice," means what it
says and is binding upon the parties. Similarly,
the plain and simple statement in the PDRG, that
the due process procedures established there did
"not form an employment contract," likewise
means what it says. [811 F2d 974.]

In the instant case, plaintiff received handbooks
containing disciplinary guidelines.[7] She claims the
guidelines at least create a question for the jury
regarding the existence of a contract providing
termination for cause.

However, similar to the "sign-off sheet" in *Dell,*
in the instant case the 1983 handbook[8] contained
unequivocal language expressing defendant's ter-
mination-at-will policy. Under a heading entitled
"Employment Relationship," a paragraph in the
1983 handbook provided:

Because business requirements fluctuate often in
our industry, your employment conditions and
status are subject to change at any time. There-
fore, although you may have been hired for a
specific position, with specified hours, pay, duties,
etc., all of these can be reduced, increased or, in
fact, terminated without advance notice and for
any reason. Consequently, you also have the right
to terminate your employment in the same man-

---

[7] The disciplinary guidelines are essentially the same in all the
manuals. The guidelines as printed in the May, 1983, handbook are
set out in the attached appendix.

[8] According to the record, this was the last in a series of handbooks
distributed to plaintiff.

ner, at any time, for any reason. This lack of a
guarantee or an employment contract also applies
to other benefits, privileges and working conditions
of employment at Montgomery Ward.

Whatever the nature of plaintiff's expectations
with regard to termination prior to the issuance of
the 1983 manual, the last handbook distributed to
plaintiff, we find that the 1983 manual clearly and
unambiguously notified plaintiff of the company's
termination-at-will policy. We are persuaded there-
fore that the 1983 manual would have succeeded
in modifying any prior expectations of termination
only for cause.[9]

Furthermore, we reject plaintiff's argument that
she did not have reasonable notice of the policy. In
addition to the May, 1983, manual, the two earlier
sign-off sheets distributed in 1982 asserted a termi-
nation-at-will policy.[10] Plaintiff was asked several
times by the personnel department to sign the
January, 1982, sign-off sheet, but she refused. We
also note that the August, 1982, sheet was ad-
dressed to "employees," not "new employees."
Also, plaintiff was not discharged until March 8,
1984. The last handbook distributed to plaintiff
was sent out at least nine months before her
discharge. Therefore, as a matter of law, we find
that the existence of three handbooks clearly pro-
viding for termination at will, the last of which
was sent to plaintiff at least nine months prior to
termination, constituted reasonable notice of de-
fendant's policy.

Moreover, we find the fact that plaintiff did not

[9] Because we find the 1983 manual clearly informed plaintiff of
defendant's termination-at-will policy, we do not reach the question
whether the guidelines actually created expectations of termination
only for cause.

[10] All three handbooks were distributed to all employees, signifying
defendant's intention that the contents were to apply to all employ-
ees.

sign the employment at will disclaimers is not determinative. If plaintiff had a prior express contract to be discharged only for cause, her assent would be required to modify the agreement. However, there was no such prior agreement. Consequently, we agree with the Court of Appeals statement that:

> Her disagreement with the provisions contained therein cannot negate their effect. She was aware of the provisions and, therefore, any contrary expectations she may have harbored cannot be deemed reasonable. [Unpublished opinion per curiam, decided November 9, 1988 (Docket No. 93817), pp 5-6.]

In light of our findings, we would hold that upon receiving the May, 1983, manual, plaintiff could no longer harbor any legitimate expectations of a discharge-for-cause policy. Defendant expressly and clearly reserved the right to discharge employees at will.

### III[11]

Justice LEVIN's lengthy dissent clearly evidences an insistence that this Court broaden the reach of his majority opinion in *Toussaint* which we elect not to do.

Thus, we respond—briefly—noting:

—In his dissenting opinion, Justice LEVIN relies on § 32 of the Restatement of Contracts, stating:

> Today, this Court, without reference to § 32 of the first Restatement of Contracts [presently § 33 of the Restatement of Contracts, 2d], and ignoring cases enforcing contracts with "as long as" terms,

[11] This section responds to the latest draft of a proposed dissent circulated, but as yet not filed, by Justice LEVIN.

promulgates its own restatement of the law in
holding that Rowe may not maintain an action to
enforce a promise to employ her for as long as she
did "the work"—selling—because, among other
reasons, the promise did not include a durational
term or a sufficiently definite durational term.
[Slip op, p 22.]

While we acknowledge the Restatement as per-
suasive authority on the subject of contracts, this
Court is not, nor is any other court, bound to
follow any of the rules set out in the Restatement.
Moreover, even assuming, as Justice LEVIN urges,
that our ruling is inconsistent with the Restate-
ment, the writings of the American Law Institute
do not control the rulings of this Court, nor is the
contract law of this state necessarily written to be
consistent with the Restatement.

—In section II(F) of his opinion, Justice LEVIN
remarks that "[c]ourts generally regard 'as long as'
contracts as considerably more than expressions of
a 'hope and noncontractual wish,' but, rather, as
expressing a durational term." *Post,* p 694.

However, 56 CJS, Master and Servant, § 31, p
414, states:

> *Permanent employment contracts. As a general
> rule* employment contracts which in some form
> purport to provide for permanent employment, as
> where the agreement is for the employee to have a
> permanent position or permanent employment or
> employment for life, or the employee is hired to
> fill a "permanent vacancy," *or where the employ-
> ment is to be for as long as the master is operat-
> ing, as long as the employee desires the position,
> or as long as the employee satisfactorily performs
> his duties,* are terminable at will by either party
> where they are not supported by any consideration
> other than the obligation of service to be per-
> formed on the one hand and wages or salary to be
> paid on the other. [Emphasis added.]

Furthermore, this Court has previously found an "as long as" statement insufficient to supply a durational term. In *Lynas, supra,* p 687, "plaintiff was offered a permanent position or one for life so long as his services were satisfactory to defendant." The Court held that a durational term was lacking and that the relationship was for an indefinite term and terminable at will.

The *Lynas* Court analogized that case to *Lord v Goldberg,* 81 Cal 596, 597-598; 22 P 1126 (1889). In *Lord,* it was

> agreed by and between plaintiff and defendants that in consideration of his entering into their employment as such solicitor, and using all his efforts to secure certain-named persons as customers, and to extend their business, "they *would give him permanent employment so long as he should use his best efforts to extend their business,* paying him at the rate of twenty dollars per week, and increase his salary as the business increased" . . . . [Emphasis added.]

The court determined that the agreement was for an indefinite term and terminable at the will of either party.

In illustrating its holding, the *Lynas* Court also cited *Rape v Mobile & O R R Co,* 136 Miss 38, 45; 100 So 585 (1924), where the plaintiff was promised to have permanent and steady employment " 'as long as he was able and willing to perform such services properly.' " The court found that there was no durational term and the agreement was terminable at will.

In another case cited as illustrative by the *Lynas* Court, *Arentz v Morse Dry Dock & Repair Co,* 249 NY 439, 441; 164 NE 342 (1928), the plaintiff alleged that he was orally promised a permanent position, or a lifetime employment contract. In

finding an agreement for termination at will, the Court of Appeals of New York stated that "[a]n agreement to employ the plaintiff in such a position for life is so unusual that we would expect to find it contained in some writing." The court later asked:

> Are we justified in saying that under all these circumstances the plaintiff has proved a life employment, or what amounts to about the same thing, an employment which is to last as long as the corporation does business, and the plaintiff's services are satisfactory? Such contracts at least should be specific and definite, with little or no room for misunderstanding, even if they are not required to be in writing. [*Id.*, p 443.]

The history behind the *Lynas* case teaches us that "as long as" statements do not necessarily provide durational terms, and contracts providing for permanent employment should be specific and definite with regard to duration.

—Many of the cases cited by Justice LEVIN in section II(F) of his opinion are distinguishable from this case. Of the ones that are not distinguished here, none are controlling with respect to this Court.

—The following cases cited in Justice LEVIN's opinion are distinguishable from this case because they are not employment contract cases: *City of Superior v Douglas Co Telephone Co,* 141 Wis 363; 122 NW 1023 (1909); *Caplis v Monroe,* 228 Mich 586; 200 NW 123 (1924); *Long Beach Drug Co v United Drug Co,* 13 Cal 2d 158; 88 P2d 698 (1939); *Fuchs v United Motor Stage Co, Inc,* 135 Ohio St 509; 21 NE2d 669 (1939); *Phelps v Shawprint, Inc,* 328 Mass 352; 103 NE2d 687 (1952); *Big Spring v Texas Bd of Control,* 404 SW2d 810 (Tex, 1966);

*State v Orkin Exterminating Co, Inc,* 528 So 2d 198 (La App, 1988).

—In the following cases, the contract provisions outlining durational terms are clearly and specifically set out in writing so that the parties' intent is more easily discernible. Of course, in the instant case, we must attempt to ascertain the parties' intent from vague oral statements: *Fuchs; Long Beach Drug Co; Big Spring, supra; McMullan v Dickinson Co,* 60 Minn 156; 62 NW 120 (1895); *Kirkley v F H Roberts Co,* 268 Mass 246; 167 NE 289 (1929).

In *Diggs IV v Pepsi-Cola Metropolitan Bottling Co, Inc,* 861 F2d 914 (CA 6, 1988), the court found an enforceable oral promise that as long as the plaintiff's performance was satisfactory, he would have a job. However, in *Diggs,* the promise was made in response to the plaintiff's direct inquiries about job security. In the instant case, plaintiff made no inquiries about job security. Whether the parties to a contract negotiate or specifically discuss a subject is relevant to a determination regarding mutual assent. Furthermore, the court in *Diggs* mischaracterizes the district court's decision in *Carpenter, supra.* The court in *Diggs* states that "[u]nlike Carpenter, Diggs did not sign an 'employment-at-will' clause." 861 F2d 918. However, the plaintiff in *Carpenter* also did not sign the employment application containing the clause.[12]

In *Ehrenworth v Stuhmer & Co,* 229 NY 210; 128 NE 108 (1920), the plaintiff agreed to exclusively sell black bread made by the defendant, and the defendant agreed to furnish the plaintiff with all his black bread requirements. The agreement

---

[12] After discussing the language in the employment application, the *Carpenter* court stated, "secondly and more importantly, as noted before, [the plaintiff] has not established any basis for a specific durational contract." 650 F Supp 937.

was to last as long as both parties remained in business. Since the plaintiff was an exclusive agent, selling only the defendant's black bread, the circumstances were more conducive to finding a durational term. Also, the statement that as long as both parties are in business provides a definite standard, whereas "as long as she sold" is a vague, isolated statement on which to pin a term of duration.

In *State v Orkin Exterminating Co, Inc, supra,* p 199, pest control services were "for the lifetime of the treated structure so long as the customer paid a specified annual renewal fee." The court focused on the phrase the "lifetime of the structure" in finding the term definite and ascertainable. However, in this state, lifetime employment contracts are indefinite and terminable at will.[13]

—In section VII of his opinion, Justice LEVIN incorrectly determines that plaintiff did not assert that the 1983 manual, or procedures found therein, provided a basis for a finding of just cause employment.

Virtually the same disciplinary guidelines are found in each of the manuals. Plaintiff's brief sets out what it refers to as "four major evidentiary features" in the case: (1) the 1982 handbook, (2) the 1983 handbook, (3) the "sign-off" sheet, and (4) the testimony of Mr. Harryman and 1976 Rules of Conduct.

Further, the plaintiff's brief later states:

It is Plaintiff's contention that the 1982 hand-

---

[13] The court noted:

Both lifetime contracts for employment and health club memberships are not enforced as definite contracts by legislative act. [Citation omitted.] There is no legal basis for Orkin's assertion that lifetime contracts are indefinite and will not be specifically enforced in Louisiana. [528 So 2d 201.]

book is a reiteration of the "for cause" policy first established by Mr. Harryman's statement and the 1976 personal rules of conduct. *This means that there are three separate bases for Ms. Rowe's objective expectancy that she would not be terminated except for cause, i.e., the oral statements, the 1976 Personal Rules of Conduct (Exhibit 2), and the 1982 handbook (Exhibit 10).* [Emphasis added.]

Plaintiff also argued in the Court of Appeals that the disciplinary classifications found in the manuals supported an agreement for just-cause employment. The Court of Appeals stated:

Plaintiff asserts that the jury was properly allowed to decide what type of contract existed in the instant case because two factors raised an issue for the trier of fact. Those two factors were: (1) the promise allegedly made to plaintiff at her job interview that she would have a job as long as she met her sales quota, and (2) defendant's disciplinary classification and procedure. As to the latter factor, plaintiff claimed that, because the classification encompassed misconduct that would constitute good cause for discharge, such created a reasonable expectation in the employees that they would not be discharged except for good cause. [Slip op, p 5.]

Along the same lines, Justice LEVIN argues that we incorrectly framed the issue. In so arguing, he states that "Rowe's express contract claim for wrongful discharge does not depend at all on Montgomery Ward's 'written policy statements' or on terms left to inference,"[14] thus flying in the face of the passages set out above that plaintiff did assert that the guidelines found within the manuals formed the basis for a just-cause contract.

14 *Post*, p 679.

### CONCLUSION

In summary, we find the oral statements relied on by plaintiff insufficient to rise to the level of an agreement providing termination only for just cause. Moreover, the circumstances do not support a finding of mutual assent on a provision for permanent employment.

We also find that the "Rules of Personal Conduct" did not create a contract terminable only for cause.

Finally, plaintiff cannot maintain an action for breach of contract on the basis of the disciplinary guidelines because the last handbook which plaintiff received clearly set forth an employment-at-will policy. Thus, we would affirm the decision of the Court of Appeals.

BRICKLEY and GRIFFIN, JJ., concurred with RILEY, J.

### APPENDIX

Disciplinary Action Guidelines

Disciplinary guidelines have been established so that you know exactly what the company expects of you. These guidelines detail the actions that will cause disciplinary action to be taken by the company.

There are four types of discipline that may be used by supervisors to correct improper conduct/performance: 1) written warning(s); 2) suspension without pay; 3) probation; and 4) separation.

Violations are categorized as Class A, B, or C. The type of disciplinary action taken will depend on the violation committed. The violations are:

Class A

Counter Productive Behavior
    An act or acts which result in theft, fraud, rape (or other sex offenses) arson, extortion, embezzlement, burglary, larceny, or violence using deadly weapons; willful violation of company conflict of interest policies; unauthorized disclosure of confidential company information; any other personal conduct which substantially limits your effectiveness as a Montgomery Ward employee by reason of its detrimental effect on the business or reputation of the company.

Insubordination
    Refusal to follow direct instructions from a supervisor or manager.

Use or Possession of Deadly Weapons
    Unauthorized use or possession of explosives, firearms or other weapons, on company premises or while performing company business.

Irresponsible Actions
    Behavior which creates a substantial and unjustifiable risk or harm to another person; serious damage to company property; damage to the property or person of others while on company time or premises. Includes, but is not limited to: harassment of other employees or customers; reckless

use of company equipment; physical assault, or attempted physical assault on any fellow employee, customer, vendor or visitor.

### Trafficking or Use of Drugs/Alcohol

Sale, possession or use of controlled drugs or alcohol on company premises; drug or alcohol dependency that substantially interferes with your ability to perform assigned responsibilities. (If mitigating circumstances, such as bona fide legal disability are present, the employee may be reinstated with satisfactory evidence of recovery.)

### Fraudulent/Deceptive Practices

Use of company property, credit, services or employment relationship in a manner other than prescribed by Company Policy, Federal, State or Local Laws. Includes, but is not limited to: willful manipulation or falsification of any company document(s); misuse of employee/family discounts; misappropriation of company, vendor or customer property, services or credit; theft; fraud; price negotiation; or gross misuse of check cashing privileges. Refer to page 17 for discount information.

### Class B

### Hazardous Acts

Violation of applicable safety rules or actions which are in fact unsafe work practices. Includes, but is not limited to: failure to wear personal protective equipment, (safety goggles/glasses, safety toe shoes, safety belts and lanyards); report all occupational injuries or conform to applicable O.S.H.A. regulations.

### Employee Harassment

Harassment based on race, sex, age, national origin, religion, physical or mental handicap affect-

ing any aspect of employment. Includes, but is not limited to: offensive or degrading remarks or comments, innuendoes, or implication which, to a reasonable person create a hostile, intimidating or offensive work environment.

Negligent Conduct

Failure to use reasonable care in the performance of work or work related duties, which results in injury, property damage or financial loss to the company or others, which limits or interferes with profit production. Includes, but is not limited to: horseplay; excessive customer complaints; working off the time clock; and gambling.

Unauthorized Solicitation

Distribution of literature or soliciting membership in unions, fraternal, religious, social or political organizations, while on company time; or to those who seek or have a business relationship with the company, except such activities that are officially and expressly authorized by the company.

Aiding and Abetting Gross Violations

Association with fellow employees in an unlicensed or unlawful way. Includes aiding or abetting any conduct classified as Class A violations.

Class C

Reporting to Work in Unfit Condition

Reporting to work when so physically, mentally, or emotionally impaired as to be unable to satisfactorily perform assigned responsibilities.

Excessive Absenteeism/Tardiness

Excessive absences from work, late reporting, long breaks, leaving early or other violations of company work schedules.

Unauthorized Smoking

Smoking in non-designated areas. Includes, but is not limited to: sales floor; auto service center stock; or warehouse areas.

Violation of Uniform or Dress Regulations

Failure to follow a standard of dress appropriate for the business situation involved. Includes, but is not limited to: safety toe shoes; product service technician, automotive or truck driver uniforms; or local regulations as established by management.

Lounging/Loafing

Behavior during scheduled work hours that demonstrates significant lack of attention to assigned duties or responsibilities. Includes, but is not limited to: sleeping; reading for personal pleasure; or extensive personal telephone calls.

Violation of Company Policy

Violation of applicable policies and procedures not otherwise specifically referred to in the disciplinary guidelines.

NOTE: *The above guidelines are not all inclusive of violations for which you can be disciplined.* [Emphasis added.]

BOYLE, J. (*concurring*). I agree with the affirmance of the decision of the Court of Appeals and parts I, II and III of Justice RILEY's opinion.[1] Plaintiff's proofs are insufficient to support the inference of a promise of termination only for just cause.

I

I read part I of the opinion to stand for the

[1] This opinion responds to the latest draft of a proposed dissent circulated by Justice LEVIN.

proposition that plaintiff's proofs are insufficient to permit a reasonable juror to find that the employer made a commitment that a reasonable promisee would believe amounted to a promise of termination only for just cause.[2]

> The employment-at-will rule reflected a policy judgment that informal promises of informal employment security should not be taken seriously by the law, unless the employee offers an indication that both parties meant for their deal to be enforced. [Perritt, Employee Dismissal Law & Practice (2d ed), § 4.2, p 176.]

Professor Epstein explains that rules of construction are adopted to reflect "the dominant practice in a given class of cases and because that practice is itself regarded as making good sense for the standard transactions it governs." Epstein, *In defense of the contract at will,* 51 U Chi L R 947, 951 (1984). It has not been demonstrated that the dominant practice of employment-at-will arrangements in the oral promise employment context has shifted sufficiently to warrant determination that the practice no longer makes sense and to reject the rule of construction that presumes employment at will.

Drawing on the facts of *Toussaint* and *Ebling,*[3] the lead opinion sets forth a list[4] of some of the

---

[2] I do not read Justice Riley's opinion as rejecting the claim that if the parties' intention appears, it is that intention that should be enforced. 2 Restatement Contracts, 2d, § 201, pp 83-86; Farnsworth, Contracts, §§ 7.15-7.16, pp 517-526; *Darlington v General Electric,* 350 Pa Super 183; 504 A2d 306 (1986).

[3] *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579; 292 NW2d 880 (1980).

[4] Among the circumstances identified as objective indications of intent are the clarity, specificity, and lack of ambiguity of oral statements; whether there were specific negotiations for job security; the nature of the position; and whether, if policy statements are relied on, they support or undercut a reasonable belief that a promise of job security was being extended.

circumstances that are of assistance in determining the threshold issue of intent. Even where there is proof that an employer made an *express* statement of job security, for "as long as I sold," or "forever," it does not follow that a promise to continue employment until cause existed for termination must be inferred. *Lynas v Maxwell Farms,* 279 Mich 684, 687; 273 NW 315 (1937) ("permanent position or one for life so long as his services were satisfactory to defendant"); *Sullivan v Detroit, Y & AA R,* 135 Mich 661, 676; 98 NW 756 (1904) (circumstances insufficient to support a contract contemplating that the plaintiff would be employed "as long as he was able to do the legal work of the defendant"). Stated otherwise, where the parties have not supplied a durational term, employment at will is the inferred term that the court supplies by construction. It will be overcome by circumstances establishing that the nonexistence of the presumption is more likely than not.[5]

The court's description of the method of analysis in *Darlington v General Electric,* 350 Pa Super

---

[5] Where the parties' intention is not apparent and the facts and circumstances advanced by the plaintiff are sufficient to show it is more likely than not that a reasonable promisee would believe that the employer was making a commitment that amounted to a promise of job security, the court will conclude, as a threshold matter, that the presumption has been overcome. Where facts and circumstances are contradicted and reasonable minds can differ, the jury will determine the facts and circumstances that actually obtained, whether there was a commitment amounting to a promise, and whether the promise was breached. Where the facts and circumstances produced would not warrant a reasonable juror in finding a promise of job security, the question cannot be put to the jury, *Leslie v Mendelson,* 302 Mich 95, 104; 4 NW2d 481 (1942). To experienced practitioners of employment law, this formulation may appear at best, unnecessary—at worst, simplistic. It is here to balance the perhaps unduly cryptic language in *Bullock v Automobile Club of Michigan,* 432 Mich 472, 483; 444 NW2d 114 (1989), that the determination (of the effect of these manuals) "must await further discovery and *perhaps* trial." (Emphasis added.)

183, 200; 504 A2d 306 (1986), an employment case, is instructive:

> When "sufficient additional consideration" is present, courts infer that the parties *intended* that the contract will not be terminable at-will. This inference may be nothing more than a legal fiction because it is possible that in a given case, the parties never truly contemplated how long the employment would last even though additional consideration is present. Even so, the at-will presumption would be overcome. On the other hand, if the parties specifically agreed that the employment would be *at-will,* even though additional consideration were present, we would expect a court to construe the contract according to the parties' stated intention and hold it to be at-will. Thus, we start with the usual at-will presumption which, let us say, has not been overcome by evidence of a contract for a term or for a reasonable length of time. Then, if sufficient additional consideration is present, the law presumes this to be sufficient to rebut the at-will presumption. . . . However, the presumption created by the additional consideration rule could *itself* be rebutted by evidence that the parties specifically contracted for employment at-will. [Emphasis in the original.]

As *Toussaint* and *Ebling* illustrate, reliance or special consideration as a result of bargaining is an objective indication that the existence of job security is more probable than not. Otherwise stated, it is circumstantial evidence that the omitted durational term that the court would otherwise infer (employment at will) does not reflect the parties' intent. Thus, while the oral contract prong of *Toussaint* and *Ebling* recognizes that validation devices[6] provide circumstantial evidence rebutting

---

[6] Chief Justice Cavanagh incorrectly observes that the oral contract claim in *Toussaint* did not "rely on the policy manual," *post,* p 721. "Toussaint's case is, if anything, stronger because he was handed

the presumption of employment at will, neither case is to be construed as creating a rule of substantive law that words of commitment must be interpreted as words of promise which must be submitted to the factfinder.

As Professor Perritt states,

> Part of the idea of offer and acceptance or meeting of the minds in contract theory is to require that a promise be supported by some sort of validation device before the law enforces it. A competing approach to promise enforcement has received little support in the cases: essentially to forget about validation devices and enforce employer promises of employment security merely upon proof the employer made them. [Perritt, *supra,* § 4.12, pp 197-198. Emphasis omitted.]

This is not to say that consideration in addition to rendering services is essential to enforceability in employment cases; it is to say that the more ambiguous the circumstances, the more appropriate it is to look for objective indications of assent.

Professor Farnsworth likewise observes, when determining whether circumstances constitute an offer,

> [t]he fact that a proposal is very detailed suggests that it is an offer, while omission of many terms suggests that it is not. "The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement." [Farnsworth, Contracts, § 3.10, p 127, quoting the comment to UCC 2-204.]

---

a manual of Blue Cross personnel policies which reinforced the oral assurance of job security," *Toussaint,* p 597. "Toussaint's testimony was sufficient to create a question of fact for the jury whether there was a mutual understanding that it was company policy not to discharge an employee 'as long as [he] did [his] job,' and that this policy, expressed in documents (which said 'for just cause only'), assertedly handed to Toussaint when he was hired, would apply to him as to other Blue Cross employees." *Id.,* p 613.

Courts will infer a reasonable price or other term to avoid a problem with indefiniteness. However, when "the indefiniteness goes to the central question of the quantity of work to be done,[7] and there is no satisfactory external standard of reasonableness to answer it," courts are much more reluctant to infer a durational term. Farnsworth, *supra*, § 3.28, p 197. Thus, when considering whether a statement constitutes an offer, in the context of commercial contracts, courts construe a statement as nonpromissory if it would expose the maker to the risk of being bound to perform beyond his means to perform.

Even under the liberalized requirement of definiteness under the Uniform Commercial Code

> which permits a contract to be found with many open terms emphasizes two fundamental requirements: (1) a manifest intention to make a contract, and (2) a reasonably certain basis for giving an appropriate remedy. . . . If an employee has begun to perform with the acquiescence of the employer, there can be no question that the parties intended to make a contract. However, absent other manifestations of intention, how shall a court read a definite term into such a contract to provide an appropriate remedy . . . ? [I]t is not possible to decide upon a suitable term of employment where there is no objective manifestation of the parties' intention to guide the court. [*Darlington v General Electric, supra,* p 197.]

In most employment arrangements, the durational term is central to the agreement because it is inseparable from the threshold question whether a commitment could reasonably be understood to be a promise.

I agree with Justice Riley's conclusion that

---

[7] In the area of sales of goods, for example, courts will infer almost every kind of term except the quantity term.

there is an insufficient basis to overcome the presumption and supply an omitted durational term. In this context, the standard of performance is not sufficient to guide the Court on the central question of the parties' intent regarding the duration of the employment relationship.

II

It is black letter law that enforceable obligations may arise from "explicit" promises, Perritt, *supra*, § 4.1, p 173, from promises implied in fact, or obligations implied in law (such as the policy or legitimate-expectations prong of *Toussaint v Blue Cross & Blue Shield*). An enforceable obligation under the contract prong of *Toussaint* can arise from an explicit promise or can be inferred from words or other conduct.[8] "Sometimes a contract that results from words is described as 'express,' while one that results from conduct is described as 'implied in fact,' but the distinction as such has no legal consequences." Farnsworth, *supra*, § 3.10, p 124.

When the communication between parties has more than one possible meaning and that formula-

---

[8] Contrary to Justice LEVIN's assertion, the Rules of Personal Conduct (or other policy statements) may be relevant to an inquiry into Rowe's claims under the contract prong of *Toussaint*. The facts of *Toussaint* are illustrative. Toussaint inquired regarding job security, and a manual was handed to him in response. *Id.,* pp 598, 617. The manual, which Toussaint asserted became part of his contract, included an explicit provision limiting dismissal to just cause. *Id.,* p 597, n 5. In contrast, Rowe received a copy of the Rules of Personal Conduct which enumerated grounds for immediate dismissal, but failed to limit discharge to those grounds and omitted any discussion regarding just cause. Unlike the manual relied on in *Toussaint,* the Rules of Personal Conduct fail to support Rowe's contention that her agreement with her employer was anything other than the at-will term inferred where a durational term is omitted or ambiguous.

Like the manual in *Toussaint,* the Rules of Personal Conduct also may be analyzed under the policy prong of *Toussaint* to determine whether it gives rise to legitimate expectations, an obligation implied in law. See RILEY, J., part II, *ante,* pp 646-651.

tion is submitted to a court, the court employs its own criteria for interpretation. Likewise, when a contract is incomplete because it fails to provide for a contingency, courts both at common law and under the Restatement may supply constructive conditions or "gap fillers" to avoid failure for indefiniteness. See, generally, Goetz & Scott, *The limits of expanded choice: An analysis of the interaction between express and implied contract terms,* 73 Cal L R 261 (1985).

Thus, even in employment contracts where courts have been much more reluctant to cure indefiniteness in duration, if the amount of work to be done is definite, a term that it must be done within a reasonable time will be supplied and enforced, *Browne & Co v Sharkey Co,* 58 Or 480; 115 P 156 (1911), as would a reference to a measurable time period such as, " 'as long as' John Engler is Governor, or MICHAEL F. CAVANAGH is Chief Justice," LEVIN, J., *post,* p 700, which clearly refers to an external standard of durational measure.

Farnsworth describes the process by which a court analyzes a dispute over an omitted term by observing that in order to determine what the parties have not said, it is first necessary to determine what they have said. Farnsworth, *Disputes over omission in contracts,* 68 Colum L R 860, 874 (1968).

> The first step in deciding whether the requirement of definiteness has been met is to interpret the language of the agreement. [Farnsworth, Contracts, § 3.28, p 195.]

Thus, the process of supplying omitted terms begins with an incipient dispute over expression, for finding an omitted term "is itself an exercise in

interpretation of the contract to decide whether or not the parties have provided for the case." Farnsworth, 68 Colum L R 873-874.

In this case, to determine what the parties have not said, we examine the language "as long as she sold," which the dissent finds is a "*definite* term of employment." (*Post,* p 688. Emphasis added.) The dissent eschews interpretation of the language in question, and characterizes the language as an absolute promise that would terminate only on the happening of a condition or event, i.e., failure to sell the quota.[9]

It is apparent, however, that the "as long as" language can be interpreted two ways: either in a temporal sense or in a qualitative sense,[10] that is, that your employment will last "as long as" you sell or your employment will last "as long as" your sales are satisfactory. The term is less definite than "lifetime" or "permanent employment," which has a temporal reference only, but in referring to a sales draw, it may be understood to mean as long as the employee is able to do the work properly and the employer continues in the business. Stated otherwise, the words "as long as," like "permanent" and "lifetime," may be taken either literally as an obligation in perpetuity or seen as an offer of steady employment.

Since, in this case, there is more than one

[9] While Justice LEVIN characterizes the durational term of the offer as " 'as long as [she was] able to do the work,' " citing the Restatement, *post,* p 691, the proofs rest on the words, "as long as she sold."

[10] "As long as" does not establish the scope or duration of the agreement. See, e.g., *Tanner Co v Sparta-Tomah Broadcasting Co,* 716 F2d 1155, 1158-1159 (CA 7, 1983) (applying Wisconsin law); *Starling v Valmac Industries, Inc,* 589 F2d 382, 387 (CA 8, 1979); *Fleming v Mack Trucks, Inc,* 308 F Supp 917, 920 (ED Pa, 1981); cf. *Davie v Lumberman's Mining Co,* 93 Mich 491, 492; 53 NW 625 (1892) ("as long as" they could make it pay, too uncertain to enforce an executory contract) with *Caplis v Monroe,* 228 Mich 586, 588; 200 NW 123 (1924) (" 'as long as I paid the rent that I could stay there *until she sold the property*' "). (Emphasis added.)

possible meaning of the language "as long as" she
sold, a meaning that signals a temporal limit and
another that provides in generalized terms for the
performance expectation of the employer, I cannot
agree that the "plain meaning" of the language
employed addresses when or how termination will
occur, or binds the employer for any particular
length of time.

> Terms such as "permanent employment" have
> no immutable meaning. When used in different
> concrete situations by different individuals differ-
> ent meanings may fairly be attached to the term.
> If the employee has paid in money or in some
> other way for the promise of "permanent employ-
> ment," it is likely that both parties understood
> that employment was to endure as long as the
> employee is able to perform the work for which he
> is hired or at least until retirement age. The
> payment of a consideration is an evidentiary factor
> bearing on the proper interpretation of the parties'
> intention. It follows that other evidentiary factors
> can perform the same function. In each case all of
> the circumstances are to be considered. It may be
> shown that the parties meant or did not mean
> something definite. [Calamari & Perillo, Contracts
> (3d ed), § 2-9, pp 60-61.]

If this problem is analyzed as a dispute over
interpretation, i.e., the meaning of "as long as," I
read Justice Riley's opinion as fully consistent
with the rule of construction, acknowledged in
*Toussaint,* that the Court's task is "to construe
'permanent' consistent with the circumstances sur-
rounding the formation of the contract . . . ." *Id.,*
p 609.

If analyzed as a case of an omitted term, Farns-
worth, *supra,* § 7.17, pp 531-532, the result is also
fully consistent with courts that have regularly
found that an agreement that is silent with re-

spect to termination is an omitted case, despite absolute promises on both sides. Then, by implication, they have almost invariably supplied a term allowing either party to terminate at will.[11]

When one party seeks to terminate an agreement that is silent with respect to termination, the other party may claim that silence is not omission and that, since the promises of the parties are absolute, the agreement admits of no termination. Despite the superficial appeal of this argument, courts have had little difficulty in resolving the threshold problem of interpretation so as to find an omitted case. Farnsworth, *supra,* § 7.17, pp 531-532. Farnsworth emphasizes that although this dispute arises frequently in the employment context, "[c]onscious of the traditionally intimate nature of the relationship between employer and employee, courts have regularly found that termination is an omitted case, despite absolute promises on both sides. Then by implication they have almost invariably supplied a term allowing either party to terminate at will." *Id.,* p 532.

Farnsworth explains that, just as modern courts conclude that promises in a bilateral contract are not absolute, but include constructive conditions of exchange, they conclude that the promise relied on here cannot be read to supply a durational term. In the seventeenth century, early common-law courts held that bilateral promises were absolute unless one of the parties explicitly qualified the promise. Thus, if one party failed to perform, the other party "could not escape liability merely because the other party had not performed what he had promised in return." Farnsworth, 68 Colum L R 863. Later common-law courts concluded that

---

[11] This is not to say that relief may not be awarded under an indefinite agreement on the basis of the terms of the agreement, restitution, or reliance. Farnsworth, *supra,* § 3.30, pp 208-210.

despite an absolute promise, the performance of each parties' promise "is made a condition of the duty to perform the other . . . ." Farnsworth, *supra,* § 8.9, p 579.

According to Farnsworth, modern courts do not follow a literal approach to contract construction but "take greater liberties in defining its [the contract's] scope." Farnsworth, 68 Colum L R 863. Rather than interpreting the promises as absolute, modern courts conclude that each promise defines the party's performance, but does not necessarily address the conditions of performance. Thus, the courts conclude that they are dealing with an omitted term, the conditions of performance. The same reasoning applies when courts consider language such as the "as long as she sold" statement upon which the plaintiff predicates her claim.

Despite the fact that modern courts reject this literal approach and conclude that neither party intended the language to cover the duration or scope of the obligation, Farnsworth, *supra,* § 7.17, pp 531-532, the dissent would read the words as absolute, resulting in an obligation conceivably extending for the plaintiff's life. The approach confirms the accuracy of the observation that the dissent "clearly evidences an insistence that this Court broaden the reach of . . . *Toussaint,*" RILEY, J., *ante,* p 651, an observation that is further supported by comparing the analysis here with that of the *Toussaint* majority.

In *Toussaint,* the majority assumed the validity of precedent that a contract for "permanent" employment was for an indefinite term, *Lynas v Maxwell Farms, supra,* and found that an employee hired for an indefinite term may nonetheless have an enforceable obligation of "for cause" discharge. In this case, despite the recognition in *Toussaint* of the fact that our precedents require

construing " 'permanent' consistent with the circumstances surrounding the formation of the contract," *id.,* p 609, the dissent relies on the plain meaning of "as long as" to supply a durational term.[12]

Finally, I read Justice Riley's opinion as consistent with the modern view of 1 Restatement Contracts, 2d, § 33 and the UCC 2-204(3), that indefiniteness regarding material terms does not prevent a contract from existing,[13] and that context is referenced to determine the meaning of the agreement. 1 Restatement Contracts, 2d, § 33 appears in the chapter of the work which deals with offers. It expresses the view that a court should not find that there is no contract simply because "one or more of the terms of a proposed bargain are left open or uncertain," § 33(3). That the illustration relied on by Justice Levin addresses the enforceability of the promise, not its duration, is supported both by comment (d) that "[w]hen the contract

[12] Justice Levin implicitly acknowledges the lack of an explicit durational term when he discusses the parties' contentions regarding the existence or nonexistence of a just-cause term. *Post,* p 681, n 8. According to the dissent, the statement upon which Rowe predicates her claim defines the "work to be done, the compensation to be paid, and a durational term of the contract, so that the trier of fact may find, upon acceptance of the offer, an express contract of employment was formed for as long as the employee is able to do the work." *Post,* pp 687-688. Nowhere in this statement is there any reference to a just-cause dismissal term. Furthermore, if the logic of the dissent is adopted, this "not unusual promise of employment for as long as the employee is able to do the work," *post,* p 686, would preclude an employer from terminating for any reason except a failure to meet the standard of performance. Even if Justice Levin limited the "as long as she sold" statement with the Rules of Personal Conduct, the employer would be entitled to terminate only for failure to sell or for one of the enumerated grounds for immediate dismissal. A termination on the basis of any other ground, including an economic downturn requiring layoffs, a business reorganization, excessive absenteeism, or chronic tardiness, would presumably be a breach of contract.

[13] As observed in concurrence in *Dumas v Auto Club Ins Ass'n,* 437 Mich 521; 473 NW2d 652 (1991), the Court would not be precluded from resorting to "gap fillers" analogous to those contemplated under the UCC to supply an omitted term or to resolve an ambiguity.

calls for successive performances but is indefinite in duration, it is commonly terminable ·by either party, with or without a requirement of reasonable notice," and by the Reporter's note to comment (d), citing *Tanenbaum Textile Co, Inc v Sidran,* 423 SW2d 635, 637 (Tex Civ App, 1968). In *Tanenbaum,* a manufacturer was obligated to pay a one percent commission on sales produced by the plaintiff, against the defendant's claim that "the agreement . . . is too indefinite to be enforceable in that: (1) its duration is not specified . . . ."

While holding that the law would imply that a reasonable time was the durational term intended by the parties and that the contract was not too indefinite to be enforced, the court specifically stated:

> Where a contract is silent as to the time it is to run, or provides that it is to run for an indefinite term, it is not invalid for that reason *but may be terminated by either party at any time.* [*Id.,* p 637. Emphasis added.]

In sum, I read part I of the opinion to be fully consistent with the black letter rule that where the parties have failed to set forth a material term, the court must interpret the language and conduct to determine the parties' intent.

### III

The plaintiff relied on a promissory theory of liability and the implied-in-law policy prong of *Toussaint.* In the context of employment arrangements, a promissory theory of liability is analyzed in light of the presumption of employment at will, a procedural device that, like other presumptions, is simply a legal recognition of the normal expec-

tations of parties in most employment situations.[14] Where it is asserted that the proofs are insufficient to create an issue of fact, the promissory implied-in-fact claim requires the court to focus on the words or actions of the defendant to determine whether there is sufficient evidence manifesting an intention to make a commitment of job security. Where the defendant's commitment-making actions predominate, that is, where it is more likely than not that a reasonable promisee would believe that the employer was making a commitment that amounted to a promise, the presumption is overcome. Where the defendant's commitment-making actions do not predominate and there exists no other basis to supply a term regarding the scope or duration of the obligation, the promissory theory is an inappropriate rationalization for an enforceable obligation. Pettit, *Modern unilateral contracts*, 63 Boston U L R 551 (1983).

Because I agree that on this record the "defendant's commitment-making actions do not predominate," *id.*, p 577, I agree that the decision of the Court of Appeals should be affirmed.

The following opinion was filed with the Clerk of the Supreme Court on August 2, 1991, after the release of the opinion of the Court on July 31, 1991—REPORTER.

LEVIN, J. (*dissenting*).

I

The lead and concurring opinions misstate the issue, and proceed on the basis of a mistaken assumption.

---

[14] The presumption does not prevent proof of actual intent and should not be employed to permit unjustified evasions of promissory liability.

A

The mistaken assumption concerns a fundamental point of law. It is assumed that statements made to Mary Rowe, corroborated by the person who hired her, advising that "as long as I sold, I would have a job at Montgomery Ward," did not provide a *durational term* for the contract of employment that most assuredly was entered into when Rowe went to work for Montgomery Ward.[1]

Section 32 of the first Restatement of Contracts stated that "a method *is* provided for *determining the length of the engagement*"—and, thus, a durational term—where A promises B to employ him,

---

[1]  Stated otherwise, where the parties *have not supplied a durational term,* employment at will is the inferred term that the court supplies by construction. [BOYLE, J., *ante,* p 664. Emphasis added.]

Otherwise stated, it [reliance or special consideration] is circumstantial evidence that the *omitted durational term* that the court would otherwise infer (employment at will) does not reflect the parties' intent. [*Id.,* p 665. Emphasis added.]

[C]ourts are much more reluctant to *infer a durational term.* [*Id.,* p 667. Emphasis added.]

In most employment arrangements, the *durational term* is central to the agreement because it is inseparable from the threshold question whether a commitment could reasonably be understood to be a promise. [*Id.* Emphasis added.]

I agree with Justice RILEY's conclusion that there is an insufficient basis to overcome the presumption and supply an *omitted durational term.* In this context, the standard of performance is not sufficient to guide the Court on the central question of the parties' intent regarding the duration of the employment relationship. [*Id.,* pp 667-668. Emphasis added.]

It is just as true, however, that the party bearing the burden of overcoming the presumption of employment at will must convince the court either that it should supply an *omitted term* or that the circumstances are such that the jury should be permitted to so conclude. [RILEY, J., *ante,* p 639. Emphasis added.]

and B promises to serve A *"as long as B is able to do the work."* [2] (Emphasis added.)

Clearly, Professor Samuel Williston, the reporter, and Professor Arthur L. Corbin, the special advisor, and other luminaries[3] involved in the preparation of the Restatement of Contracts, were of the opinion that a promise to serve as long as one is able to do the work provides a method for determining the length of the engagement and, hence, a durational term.

B

The misstatement of the issue appears in the following sentence of the lead opinion:

> The issue posed by this case is whether defendant employer's *oral statements* and written policy statements directed at plaintiff may be interpreted to permit a promise *implied in fact* not to terminate except for cause.[4] [Emphasis added.]

A claim for wrongful discharge predicated on "oral statements directed at plaintiff"—e.g., "as long as I sold, I would have a job at Montgomery Ward"—seeks recovery on the basis of an *express* promise, *not* a promise *implied* in fact. A claim that is based on an employer's "written policy

[2] Restatement Contracts, § 32, comment c, illustration 3, pp 41-42. Now, Restatement Contracts, 2d, § 33, comment d, illustration 5, p 94.

[3] Learned Hand, Benjamin N. Cardozo, John W. Davis, Owen J. Roberts, Elihu Root, and others, were members of the Council of the Institute whose concurrence was required before a Restatement could be promulgated.

[4] RILEY, J., *ante,* p 636. The signers of the opinion conclude that "plaintiff's allegations are insufficient to support her contention of a promise *implied in fact* limiting the defendant's right to terminate her employment," *id.* (emphasis added), and that "objective evidence [is] lacking to permit a reasonable juror to find that a reasonable promisee would interpret Harryman's statements and actions as a promise of termination only for cause implied in fact." *Id.,* p 643.

statements" would, indeed, depend on an implied promise.

The signers of the lead opinion err in combining two inquiries:

—Did the "oral statements directed at" Rowe give rise to an express contract; and

—Did Montgomery Ward's "written policy statements" "imply in fact" a promise not to terminate except for cause?

In thus misstating the issue, the majority asks the wrong question, and perforce reaches the wrong answer.

Rowe's express contract claim for wrongful discharge does not depend at all on Montgomery Ward's "written policy statements"[5] or on terms left to inference. Rowe claimed, she testified, the person who hired her corroborated, and the jury found, that Montgomery Ward offered—subject to Rules of Personal Conduct that enumerated grounds for discharge[6]—to employ her to sell appli-

---

[5] Since Rowe was hired in 1976, before Montgomery Ward issued its 1982 and 1983 employee manuals or handbooks, the written policy statements there set forth have no bearing on the terms of her contract.

Rowe's assertion that the Rules of Personal Conduct gave rise to legitimate expectations that she would not be discharged at will, suggests that she was seeking recovery on an implied promise not to terminate her employment except for cause. But the majority's conclusion that no such promise can be inferred does not reach or decide the question whether the promise of employment at a stated compensation as long as she sold gave rise to an express employment contract when she accepted the offer. If, as the jury found, that promise and acceptance formed a contract, the resulting contract was express, not implied.

[6] When Rowe was hired, she was given and signed a copy of the Rules of Personal Conduct. The full text of the Rules of Personal Conduct follow:

Rules of Personal Conduct
Everyone at Wards is working for the same Company goals.

ances at a stated compensation for as long as she was able to do the work, i.e., selling.[7] Those terms

---

Your adherence to Company policies and high personal standards will help Wards and you achieve: Growth, Profit, Security, Successful career.

However, the following activities are extremely harmful to the success of our store, and anyone involved in them will be immediately dismissed:

- Theft

- D[e]struction or misappropriation of property

- Violation of accepted moral standards

- Manipulating, altering or falsifying Company records (including employment application)

- Dishonesty of any kind

You should be familiar with Wards rules and regulations and all of the procedures governing you and your job.

We are confident you will always conduct yourself according to the rules of good conduct.

I have read and agree to the above statements. My trainer has explained the Company policies and rules governing the store and my job. I understand what is expected of me as an employee.

| /s/ Mary Rowe | Aug. 9, 1976 |
|---|---|
| (Employee's name) | (Date) |
| (Trainer's name) | (Date) |

This sheet becomes a permanent part of the employee's file.

---

[7] Rowe was hired in 1976 to sell sewing machines at a store in Grand Rapids. Later she was transferred to major appliances. Rowe received a straight nine percent commission for the sale of sewing machines and six percent for the sale of major appliances.

When Rowe was hired, she was interviewed by Vernon Harryman, the manager of the appliance department. Rowe testified that Harryman explained the requirements of the job and said, "as long as I sold, I would have a job at Montgomery Ward." Harryman testified that he informed Rowe that if she did not make the amount of her draw against commission for two consecutive months, she would be reviewed and that such failure would be grounds for dismissal.

Harryman testified that commissioned salespersons were different

were all express, none were implied.

Since the promise made to Rowe stated a durational term and required no performance of Rowe other than that she sell, then, absent a term *inferred for the benefit of the employer* that she could be discharged for a cause not stated in the Rules of Personal Conduct, Rowe could be discharged only for nonperformance, i.e., failure to sell, or a cause stated in the Rules of Personal Conduct.[8]

When Montgomery Ward discharged Rowe it did not claim that she had ceased to be able to do the work, i.e., to sell. On the contrary, Rowe's sales record was exemplary.[9] The stated[10] reason for discharging Rowe was that on one occasion she left

from hourly employees: "[G]enerally, as long as they generated sales and were honest, why, they had a job at Wards, and that's the way we used to hire our people." He said that Rowe would have to sell approximately $2,000 of sewing machines a week to make her draw, and that was the number one thing, condition of employment, and that, if she failed to generate such sales for two months, her employment would be subject to termination.

[8] The Rules of Personal Conduct, insofar as they enumerated grounds for discharge, were part of the express contract asserted by Rowe.

In deciding whether Rowe was properly discharged for cause, the jury was not, however, limited to an inquiry whether she had violated the particularized grounds of discharge set forth in the Rules of Personal Conduct. Rowe acknowledged that an employee may ordinarily be discharged for cause without regard to whether such a term is expressed at the time of hiring. But, if such a term is not expressed, *it is the employer* who will later seek to establish by implication a term that he may discharge for cause although the employee otherwise has duly performed the work.

Insofar as Montgomery Ward sought to justify Rowe's discharge on the basis of a cause not stated in the Rules of Personal Conduct, it was Montgomery Ward who sought to establish by implication a term —i.e., that Rowe could be discharged for any "cause," not only cause stated in the Rules of Personal Conduct—rather than Rowe who was seeking, as the signers of the lead opinion erroneously declare, to infer a promise that her employment could not be terminated except for cause.

[9] Rowe frequently set sales records and won prizes for her sales efforts.

[10] But see n 19.

the store without permission and failed to note on her time card that she had been absent. The question whether Rowe was properly discharged for cause in failing to punch out on her time card was submitted to the jury,[11] and by its verdict[12] the jury found that Rowe's failure to punch out was not cause for discharge.[13]

---

[11] The signers of the lead opinion misstate Rowe's position when they suggest that she asserted she could "only be dismissed for failure to obtain her quota . . . ." RILEY, J., *ante,* p 644. She acknowledged that she could be dismissed for cause. See ns 8 and 65.

[12] Rowe commenced this action against Montgomery Ward in May, 1984, claiming breach of contract and wrongful discharge. The jury returned a verdict of $86,500 for Rowe. The majority does not find that, contrary to the jury's verdict, there was cause for dismissal.

[13] It does not appear that Rowe had any disciplinary record, even in the form of a warning or a reprimand during her nearly eight years with Montgomery Ward.

Rowe was scheduled to work between 1:00 P.M. and 9:00 P.M. on a Saturday in March, 1984. At about 2:00 P.M., a Montgomery Ward "loss prevention officer" observed Rowe leave through an unauthorized exit. Upon checking her time card, he observed that she had not punched out. Rowe returned about 6:00 P.M. Rowe made no notation on her time card of her extended absence from the store.

Rowe testified that another salesperson, Marie Morris, asked Rowe to switch shifts with her so that Morris could visit a terminally ill friend in the hospital. Rowe agreed, but added that she might have to attend to a personal matter on Saturday afternoon and had even considered taking all day Saturday off. Rowe also testified that the commissioned employees switched their shifts back and forth from time to time. Rowe had attempted on the previous evening to reach her supervisor to tell him of the switch, but he did not work on Friday and did not come in on Saturday. Morris confirmed Rowe's testimony about trading shifts in general, and specifically with respect to the trade that occurred that Saturday.

Rowe testified that she was familiar with the staffing needs of the department, and that she did not leave the store without assuring herself that there was an adequate number of persons staffing the major appliance department. Another employee confirmed her testimony.

Harryman testified that while all employees were required to punch in and out, these policies frequently changed. He indicated that they really had little application to commission salespersons. He said, "The number one thing was to work, attain those draw figures. It was sales. Sales covered a multitude of sins. That was our favorite slogan at Wards." He said that Rowe was the best commission salesperson he had ever worked with.

When Rowe returned to work, a security guard was waiting for her

C

Contracts with "as long as" durational terms are express contracts. The majority concludes that to maintain an action on an express "as long as" promise of employment, a promisee must establish an implied promise by the promisor not to discharge at will. The conclusion that a promisor may renege at will unless he impliedly promised not to renege at will is without support in the cases,[14] and should be viewed by promisors generally—even those who may, in the short run, believe that today's decision is to their advantage—as excessive.

D

The majority compounds the errors in misstating the issue (subpart A, p 677), and in proceeding to decision on the mistaken assumption that the promise made to Rowe did not state a durational term (subpart B, p 678), by donning the mantle of trier of fact.

On the basis of its subjective intuition that

and escorted her to the office of the store manager. Rowe was told that she had violated a company policy. She responded that she honestly did not know which policy they were talking about. When Rowe was told that she had left the store without punching her time card and had cost the company money, she responded that she worked on commission and had more sales than anyone that day. Rowe added that she was sorry that she did not punch out while gone, and would do so in the future.

Rowe said that she was asked to sign "another paper" and that she should "read it over and write down what happened and sign it." Rowe refused. The manager was then called in and said that he had no choice but to dismiss Rowe. When she responded that he would be losing the best salesperson he had, he responded, "Yes, I know," and then said something to the effect that he had no choice.

Rowe testified that she had left on that Saturday afternoon to assist her elderly and ailing father with housekeeping chores in preparing her parents' home for the return of her mother, who had been away for a number of months.

[14] See part II-F, n 34 ff, and accompanying text.

Montgomery Ward did not "in reality" agree to limit "managerial discretion" to discharge at will,[15] the majority finds that there was not "mutual assent," and that the "minds" of the parties did not meet.[16]

Under the traditional objective approach, the correct focus is not on what the promisor, Montgomery Ward, *actually* intended, but on what a reasonable person in the position of the promisee, Rowe, would conclude the offer meant.[17]

E

The lead opinion begins with a comment about *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579; 292 NW2d 880 (1980), stating that there this Court "extended job security to non-unionized employees."[18]

*Toussaint* did not, however, extend job security to nonunion employees. It simply ruled that promises of job security that had been extended—not by the courts, but rather by employers—were enforceable in a court of law. In *Valentine v General American Credit, Inc,* 420 Mich 256, 258; 362 NW2d 628 (1984), a unanimous Court said:

> *Toussaint* makes employment contracts which provide that an employee will not be dismissed except for cause enforceable *in the same manner as other contracts. It did not recognize employment as a fundamental right or create a new "special" right.* [Emphasis added.]

*Toussaint,* thus, did not create entitlement to job

---

[15] RILEY, J., *ante,* p 631.

[16] *Id.,* pp 640, 643, 644.

[17] Calamari & Perillo, Contracts (3d ed), § 2-2, p 27. See part III, n 74 ff.

[18] RILEY, J., *ante,* p 631.

security for nonunionized employees. It simply ruled that if an employer promises job security, a court of law will enforce that promise. Today, the court retreats from enforcement of a promise found on an adequate record to have been made to an employee.

Montgomery Ward, apparently responding to *Toussaint*, has required all persons newly hired since 1982 to "sign off" any claim of job security by acknowledging in writing that no promise of job security was made. Rowe was hired, however, before new employees were required to so sign, and refused to sign when asked to do so.[19]

---

[19] In 1982 or 1983, a number of years after Rowe was hired, she was asked to sign a writing stating that her employment was at will, and refused to do so. The majority does not posit its disposition of this appeal on the basis that, although she did not expressly agree thereto, she was bound by the statements in the employee manuals distributed after she was hired.

Sometime after August 1982, Montgomery Ward issued an "Employee Guide" that included an introductory letter from the company president and CEO, as well as other introductory materials suggesting that the manual was directed to new employees. A slightly different version of the manual, also directed to new employees, was issued in May, 1983.

Each version of the manual had a final "tear-out" or "cut-out" page which was labeled "Employee Sign-off Sheet," which the employee was asked to sign and return to the immediate supervisor or personnel representative for inclusion within the personnel file of the employee. The sign-off sheet stated that employment at Montgomery Ward was at will.

Rowe testified that she refused to sign this sign-off sheet when it was presented to her. The back of the document contains the inscription: "Read & do not wish to sign. 5-20-82 [/s/] Mary Rowe." Rowe testified that she said she would not sign the form, and she "didn't really think it was right to come along in 1983 and ask me to sign a new employee handbook."

According to Rowe, the following conversation occurred between her and a person in the personnel department:

A. I took it back to the office and I handed the book to them and I said, "I'm sorry, but I cannot, in truth, sign this," and I handed her the book.

Q. [*Mr. Spruit*]: And this was Ms. Foster?

A. Yes.

Q. And what did she say?

**F**

The majority also mischaracterizes the promise made to Rowe as one for "permanent" or "lifetime" employment.

A contract of employment is ordinarily deemed to be terminable at will if the parties do not agree on the duration of the employment, or agree on "permanent" or "lifetime" employment.

The signers of the lead opinion erroneously equate an "as long as" durational term with a "*permanent* employment" term.[20] "As long as one can sell" is *not* "permanent" or "for life."

Such a promise is not an "extraordinary"[21] promise of "permanent" or "lifetime" employment but, rather, a not unusual promise of employment for as long as the employee is able to do the work.

Rowe did not allege that she was promised permanent[22] employment. She claimed, rather, that she was promised employment for "as long as she sold" at the required rate. *By its terms,* such a

*A.* She said, "You have to sign it." I said, "I beg your pardon. This is a free country and I really don't feel,—if you feel in your heart that it's not right to sign, I'm not going to sign it," and she said, "If you don't sign it, you don't have a job." So this went on, I think, for almost a week, back and forth, "Sign the book," "No, I don't feel I can sign it. I'm not a new employee. It just isn't right." So finally, she said, "All right. If you don't sign the book, will you at least acknowledge that you got it?" and I said, "Yes, I will do that," and so on a sheet of paper, I wrote "refused to sign" and initialed it or signed it, that part of it.

[20] Consequently, the court stated that any orally grounded contractual obligation for *permanent* employment "must be based on more than an expression of an optimistic hope of a long relationship." [RILEY, J., *ante,* p 640. Emphasis added.]

[21] *Bullock v Automobile Club of Michigan,* 432 Mich 472, 517; 444 NW2d 114 (1989) (GRIFFIN, J.), quoted by RILEY, J., *ante,* pp 640-641.

[22] The signers of the lead opinion appear to state that the correct inquiry is whether "there was *mutual assent* on a provision for *permanent* employment." RILEY, J., *ante,* p 643 (emphasis added), see n 81, for the full text.

promise is not for "permanent" or "lifetime" employment but, rather, for employment for a durational term coextensive with the time that the employee is able to do the work.

### G

The "issue" dealt with in part II of the lead opinion was not briefed or argued by Rowe, the appellant, in this Court, and may not now properly be addressed by this Court.

Rowe has not *advocated* the position dealt with by the majority adversely to *other* employee litigants who are not now before the Court, but whose cases are pending in this Court on applications filed by *employers* for leave to appeal from decisions of the Court of Appeals.

### H

A correct statement of the question presented is: Does the evidence tending to show that Rowe was hired by Montgomery Ward on the understanding that, subject to Rules of Personal Conduct enumerating grounds for discharge, she would have a job "as long as [she] sold," sufficiently support the finding that her contract of employment was not terminable at the will of Montgomery Ward?

I would hold, contrary to the majority, that

—An offer by an employer to employ a person for stated compensation "as long as" the person "is able to do the work"—here to "sell" a sufficient amount of appliances to earn commissions at least equal to the weekly draw—defines clearly, specifically, and unambiguously the work to be done, the compensation to be paid, and a durational term of the contract, so that the trier of fact may find, upon acceptance of the offer, an express contract

of employment was formed for as long as the employee is able to do the work.

—Since the contract provides a method for determining the length of the engagement, namely, the length of time the employee is able to do the work, the duration of the contract is determinable. The duration is therefore sufficiently definite, although it is uncertain how long the employee will be able to do the work and, thus, when the contract will terminate.

—The promise made by such an employer to the employee—to provide the employee with work at a stated compensation for as long as the employee is able to do the work—is express and *not* implied.[23]

—The "presumption" of employment at will is overcome by such an express promise for a determinable and, hence, a sufficiently definite term of employment.

—An offeror's intention will be held to be what a reasonable person in the position of the other party would conclude the offer meant.

The correct inquiry in this case, therefore, is what a reasonable person in Rowe's position would conclude the offer of a job for "as long as she sold" the requisite amount of appliances, subject to Rules of Personal Conduct that enumerated grounds for discharge, meant with regard to whether her employment was terminable at the will of Montgomery Ward or only for cause.

The focus therefore should be on what Rowe could reasonably have concluded the offer meant with regard to termination of employment, and *not* on whether Montgomery Ward *actually* in-

---

[23] It is the employer, rather, who might seek to rely on a term "implied in fact," namely, that the employer may, although he did not expressly reserve the right to do so, terminate the employment—at least for cause, the employer would prefer at will—even though he expressly promised the employee employment for as long as the employee is able to do the work.

tended or meant to promise a contract providing termination only for cause.[24]

It is undisputed that Vernon Harryman, when he hired Rowe, made the promissory statements or "manifestations" that they both related at the trial, when they testified that she was told that as long as she sold she would have a job at Montgomery Ward, and that Rowe signed Rules of Personal Conduct enumerating grounds for discharge.[25]

Reasonable jurors could properly conclude on that basis that Montgomery Ward intended to provide employment not terminable at its will but only for cause, because that is what a reasonable woman in Rowe's position might reasonably conclude Montgomery Ward meant by its promissory statements or manifestations.

—The answer to the question whether the words used by the parties are sufficient to support a finding that a contract of employment was entered into does not depend on whether the words are set forth in a writing or are expressed orally. There is no rule of law requiring "objective support," in the form of a manual, other writing or other corroborative evidence, for an oral term of a contract of employment.

—A durational term of an employment contract is not negated, as a matter of law, by evidence that the employee did not, when hired, inquire about, or "negotiate" for, job security, or by evidence that the employee was seeking a sales position rather than a "singular, executive job position[ ]."[26]

---

[24] The correct inquiry is, thus, not whether the "circumstances suggest *both parties* intended to be bound" (RILEY, J., *ante,* p 636), or whether the employer has "*in reality* agreed to limit managerial discretion" (*id.,* p 631) to discharge at will. (Emphasis added.)

[25] Harryman, the manager of the appliance department, hired Rowe and corroborated her testimony. See n 7.

[26] *Id.,* p 643.

II

Rowe and Montgomery Ward indisputably entered into an express oral contract of employment when Montgomery Ward offered to employ Rowe for a stated compensation for as long as she was able to do the work, selling appliances in an amount that would earn commissions at least equal to her weekly draw, and Rowe accepted the offer and began work.

A

The question whether an "as long as" term is sufficiently certain to be enforceable has been considered by courts in a number of contexts. The author of one treatise on the law of contracts has summed up the pertinent case law as follows:

> Where the contract by its terms provides that it is to terminate upon the happening of a stated event, or that performance is to continue until the happening of a stated event, it is not too indefinite for enforcement, *even though it is impossible to tell when the event will happen.* For example, if by the contract performance is to continue *so long* as the parties are engaged in a certain business, the contract is sufficiently definite as to duration to be enforceable. Similarly, where the agreement is to make weekly payments *so long* as the promisor conducts a certain business, or where a vessel is chartered to the government for one month and *as much longer* as it may be required by the war department. Also, *where plaintiff's employment was to continue so long as workers trained by plaintiff were retained by the employer, the employment agreement was held sufficiently definite as to duration to constitute a contract, and was*

*not terminable at the will of the employer.* [Simpson, Contracts (2d ed), § 48, p 75.[27] Emphasis added.]

Section 32 of the first Restatement of Contracts spoke of the need for certainty in expression, and specifically included promises of employment.[28] The Restatement illustrated the § 32 "black letter" statement of the rule concerning "certainty" with the following example:[29]

A promises B to employ him for a stated compensation and B promises A *to serve therefor as long as B is able to do the work,* or as long as a specified business is carried on. *These promises create contracts, as a method is provided for determining the length of the engagement.* [1 Restatement Contracts, § 32, comment c, illustration 3, pp 41-42. Emphasis added.]

---

[27] The author of this treatise also recognized:

In the case of employment contracts without fixed duration it seems to be universally held that only an employment at will is created. [*Id.,* p 74.]

[28] Requirement of Certainty in the Terms of an Offer.

An offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain.

Comment:

a. Inasmuch as the law of contracts deals only with duties defined by the expressions of the parties, the rule stated in the Section is one of necessity as well as of law. The law cannot subject a person to a contractual duty or give another a contractual right unless the character thereof is fixed by the agreement of the parties. A statement by A that he will pay B what A chooses is no promise. A promise by A to give B *employment* is not wholly illusory, but if neither the character of the *employment* nor the compensation therefor is stated, the promise is so indefinite that the law cannot enforce it, even if consideration is given for it. [1 Restatement Contracts, § 32, p 40. Emphasis added.]

[29] See n 28 for the § 32 black letter statement of the rule.

That example is repeated in the Restatement of Contracts, Second.[30]

## B

Employment contracts are generally oral. The illustrative contract set forth in § 32 of the Restatement of Contracts is an employment contract. Nothing there suggests that such a contract must be in writing, or that the contract formed by the promissory exchange between A and B was in writing.

Nor could a distinction properly be drawn between "as long as I am able to do the *work*" and "as long as I am able to *sell.*" Rowe's work was selling—that is all she was hired to do. "As long as I sell" has the same meaning in her contract of employment as "as long as I am able to do the work."

## C

Samuel Williston, the reporter for, and Arthur Corbin, the special advisor to the Restatement of Contracts, are the authors of the leading multivolume treatises of the law of contracts[31]—standard works in courts, universities, and law offices throughout the country.

## D

The lead opinion relies on obiter dictum in a *footnote* that characterizes " 'as long as you do the

---

[30] A offers to employ B for a stated compensation as long as B is able to do specified work, or as long as a specified business is carried on, and B accepts the terms offered. The length of the engagement is sufficiently definite for the formation of a contract. [1 Restatement Contracts, 2d, § 33, comment d, illustration 5, p 94.]

[31] Williston on Contracts and Corbin on Contracts.

job' " as expressing a "hope and non-contractual wish."[32] The opinion containing that characterization in obiter dictum was written and signed by one judge, and cites no authority.[33]

## E

The author of the lead opinion in this case also wrote the lead opinion in the companion case of *Dumas v Auto Club Ins Ass'n,* 437 Mich 521; 473 NW2d 652 (1991). There the Court considers the enforceability of a promise to pay a seven percent renewal commission to sales representatives for "*as long as* they were employed by the Auto Club," or "forever," or "always," or "words to that effect." (Emphasis added.) The signers of the lead opinion do not, as here, say that such a promise is unenforceable because it constitutes nothing more than an expression of a "hope and noncontractual

---

[32] *Carpenter v American Excelsior Co,* 650 F Supp 933, 936, n 6 (ED Mich, 1987).

A panel of the United States Court of Appeals for the Sixth Circuit commented on *Carpenter* as follows:

> Here the district judge, as trier of fact, was faced with a specific promise coupled with a performance standard. Unlike Carpenter, Diggs did not sign an "employment-at-will" clause. [*Diggs IV v Pepsi-Cola Metropolitan Bottling Co, Inc,* 861 F2d 914, 918 (CA 6, 1988).]

Rowe did not, when hired, agree in writing or orally that her employment was at will. When she was later asked to sign such a writing, she refused. This case also presents "a specific promise coupled with a performance standard." The evidence showed that Rowe was hired with the understanding that she would have a job at Montgomery Ward as long as she generated sufficient sales to cover her weekly draw.

[33] The judge, in a subsequent opinion denying summary judgment, may have recharacterized *Carpenter* when he said that in *Carpenter* the employee had signed an application for employment acknowledging that the employee served at the will or pleasure of the company, and that in such a case a finding of a just-cause contract, sought to be predicated on policies and procedures enumerated in employee handbooks and elsewhere, was precluded. *Ross v State Farm Ins Co,* 676 F Supp 781 (ED Mich, 1987).

wish." They adopt, rather, three other modes of analysis.

Proceeding on the apparent premise that such a promise, if made, would be enforceable, the signers of the lead opinion in *Dumas* conclude that

—the one hundred thirty-nine sales representatives comprising Group A could not recover because the "as long as" promise there alleged was not "expressly" made, not because an "as long as" promise in an oral employment contract is not enforceable;

—the twenty sales representatives comprising Group B could not recover because the promise was not capable of performance within one year and was not in writing;

—the twenty sales representatives comprising Group C could not recover because the promise was not made when they were hired, but after they began work, and the circumstances did not demonstrate mutual assent.

F

Courts generally regard "as long as" contracts as considerably more than expressions of a "hope and noncontractual wish," but, rather, as expressing a durational term.

This Court, in *Caplis v Monroe,* 228 Mich 586, 588; 200 NW 123 (1924), held that an *oral* leasehold was for a term not exceeding one year, and, hence, not violative of the statute of frauds, on the basis of the tenant's testimony that the landlord told him that " 'as long as I paid the rent that I could stay there until she sold the property. . . .' " This Court said:

> The contract constituted a *concise lease in plain*

*terms of contingent but determinative duration.*
That is certain in law which can be made certain.
The specified contingency might occur within the
year and there was no understanding that it would
not. [*Id.,* p 594. Emphasis added.]

The United States Court of Appeals for the
Sixth Circuit,[34] the Supreme Court of Mississippi,[35]
a Colorado appeals court[36] and a New York trial
court[37] have held that *oral employment contracts*
for "as long as" the employee maintained his
performance at a certain level,[38] a business was
operated at the named place,[39] the plaintiff was a
stockholder of the corporation,[40] or the defendant
employer "continued to employ workers trained,

[34] A panel of the United States Court of Appeals for the Sixth
Circuit held that an oral promise to retain an employee as district
sales manager " '*as long as* his performance was maintained at a
certain level' " was enforceable. (Emphasis added.) *Diggs IV,* n 32
*supra,* p 916.

[35] The Supreme Court of Mississippi held that the term of duration
of an oral employment contract for "so long as the business was
operated at the named place" is not "so indefinite" as to render the
contract invalid "as a method is provided therein for determining the
length of the engagement." *Thorne v True-Hixon Lumber Co,* 167
Miss 266, 273; 148 So 388 (1933), relying on 1 Restatement Contracts,
§ 32, comment c, illustration 3, pp 41-42.

[36] The Colorado Court of Appeals ruled that where the plaintiff had
entered into a written contract of employment to manage a camera
supply business that he had sold, taking back ten percent of the
capital stock of the purchaser, he could, consistent with the parol
evidence rule and the one-year statute of frauds, maintain an action
for breach of an oral durational term of the written employment
contract. The oral term was "allegedly for *as long as*" (emphasis
added) the plaintiff was a stockholder of the corporation which bought
the business. *Buechner v Rouse,* 538 P2d 117, 118 (Colo App, 1975).

[37] A New York trial court held that an oral employment contract
whereby the defendant agreed to employ the plaintiff as manager *"so
long a time as"* the defendant " 'continued to employ workers,
trained, developed and gathered by plaintiff,' " "*fixed an objective
limit to the life of the contract*—the date when the employment of the
skilled workers should cease" to be in the employ of the defendant.
*Deucht v Storper,* 44 NYS2d 350, 351 (NYC, 1943). (Emphasis added.)

[38] See n 34.

[39] See n 35.

[40] See n 36.

developed and gathered by plaintiff,"[41] provided sufficiently definite durational terms.

The highest courts of Minnesota and Massachusetts dealt with nonfinite durational terms in written employment contracts. The Minnesota court held that the durational term was "sufficiently defined" where defendant agreed to employ the plaintiff *during the time* "the business of said corporation should be continued, not exceeding the term of the existence of said corporation . . . ."[42] The Massachusetts court held that the durational term was not too indefinite where the employer agreed to employ the plaintiff *"as long as"* he faithfully and diligently performed the duties at the compensation fixed.[43]

The highest court of New York held that an *oral* agreement providing that the plaintiff was the exclusive distributor of pumpernickel bread "as long as" both the plaintiff and the defendant remained in business was not "interminable" because it would last at most only as long as the plaintiff and the defendant were both in business.[44] The Supreme Court of California similarly held that an agreement providing the plaintiff with an exclusive selling agency "so long as" the plaintiff " 'shall perform the terms of [the] agreement' " was *"sufficiently certain."* [45]

In a case that may be seen as the mirror image of an exclusive distribution agreement, New York's intermediate appellate court held that a sufficient durational term was provided where the

---

[41] See n 37.

[42] *McMullan v Dickinson Co,* 60 Minn 156, 157; 62 NW 120 (1895).

[43] *Kirkley v F H Roberts Co,* 268 Mass 246, 251; 167 NE 289 (1929). (Emphasis added.)

[44] *Ehrenworth v Stuhmer & Co,* 229 NY 210, 220; 128 NE 108 (1920).

[45] *Long Beach Drug Co v United Drug Co,* 13 Cal 2d 158, 165-166; 88 P2d 698 (1939). (Emphasis added.)

plaintiff and the defendant *orally* agreed that the plaintiff would receive a weekly check from the defendant "as long as" the plaintiff, a newspaper salesman or distributor, *abstained from distributing* another newspaper. The court found that the *"duration of the contract was not unmeasured,* as it would continue until plaintiff did an act, viz., resumed the sale of the Telegram."[46]

The United States Supreme Court held that an *oral* agreement by a railroad to " 'put down the iron rails and maintain the switch for the plaintiff's benefit for shipping purposes *as long as* he needed it' " was not within the local statute of frauds applicable to "an 'agreement . . . not to be performed within . . . one year . . . .' "[47]

The Supreme Judicial Court of Massachusetts found that a promise by the individual defendants to pay the plaintiff "$100 a month, *so long as* [the individual defendants] should be connected with the defendant corporation, if [the plaintiff] should succeed in having the [individual defendants] sell their shares to them," "carried *its own measure of time* . . . even though it is impossible to predict precisely when the contingency will occur that will bring the contract to an end."[48]

"As long as" durational terms have also been found to be sufficiently certain in requirements contracts.[49] An agreement to furnish water to a

---

[46] *Rague v New York Evening Journal Publishing Co,* 164 AD 126, 126-127; 149 NYS 668 (1914). (Emphasis added.)

[47] *Warner v Texas & Pacific R Co,* 164 US 418, 434-435; 17 S Ct 147; 41 L Ed 495 (1896). (Emphasis added.)

[48] *Phelps v Shawprint, Inc,* 328 Mass 352, 353-355; 103 NE2d 687 (1952). (Emphasis added.) The report is silent whether the agreement was oral or written.

[49] Courts have held to be enforceable oral agreements for the sale of existing scrap and such as would accumulate during the course of building a dam, no definite time or quantity of material being indicated (*Mason-Walsh-Atkinson-Kier Co v Stubblefield,* 99 F2d 735 [CA 9, 1938]), and for the cutting, sawing, and hauling of lumber from a

hospital "as long as the State of Texas shall in good faith operate and maintain a hospital at the site" was found by the Supreme Court of Texas to provide a "certain and definite" term.[50] The Supreme Court of Wisconsin found that an agreement to install telephones in plaintiff's public buildings and to maintain them for "as long as" defendant should maintain and operate a telephone system in the city fixed "a time for its termination . . . ."[51] Similarly worded requirements contracts were also found to provide adequate durational terms by the Supreme Court of Ohio[52]

specific tract of land for a specific consideration, where the contract was silent with regard to duration. *W P Brown & Sons Lumber Co v Rattray,* 238 Ala 406; 192 So 851 (1939).

[50] *Big Spring v Texas Bd of Control,* 404 SW2d 810, 815 (Tex, 1966).

[51] *City of Superior v Douglas Co Telephone Co,* 141 Wis 363, 371; 122 NW 1023 (1909).

The court quoted with approval the following statement:

"The duration of a contract may be made dependent upon the expiration of a period of time, or upon the completion of a given undertaking, or the happening of some event, all of which in turn may be certain or uncertain as to the date when the undertaking may be completed, or the event may happen. This uncertainty, however, does not render the contract terminable at will." [*Robson v Mississippi River Logging Co,* 43 F 364, 370 (ND Iowa, 1890).]

In another case, the defendant agreed, under a written contract, to "furnish plaintiff steam 'while in the building occupied and used by them as a steam laundry . . . .'" The Wisconsin Supreme Court held that the term *"while"* clearly expressed duration, and thus the terms of the contract "indicate[d] that the time of the contract [was] dependent upon the event of use and occupancy of the building by plaintiff as a laundry." Accordingly, the contract was not void for indefiniteness with regard to time. *American Steam Laundry Co v Riverside Printing Co,* 171 Wis 644, 647; 177 NW 852 (1920).

[52] The Ohio Supreme Court ruled that a written requirements contract calling for performance *"so long as"* the plaintiff should own fifteen shares of stock of the defendant company, or *"so long as"* the plaintiff should continue in the business of selling gasoline, oil, and grease, provided "an ascertainable fact or event by which the *duration of the term of [the] contract* can be determined . . . ." *Fuchs v*

and a Louisiana appellate court.[53]

G

The signers of the lead opinion cite no authority for the view that Rowe's claim of an oral "as long as" contract of employment is lacking in "objective support,"[54] can give rise only to a "subjective belief,"[55] or is not "clear and unequivocal"[56] either because Rowe did not inquire about or negotiate for job security,[57] or because Rowe "stumbled" into Montgomery Ward,[58] or because she was seeking a relatively low level position as a salesperson instead of "singular, executive job positions."[59] Those factors might properly be argued to a jury, or a judge sitting as trier of fact, but do not, as a matter of law, negate formation of a durational contract term on the basis of the words spoken when Rowe was hired.

The signers of the lead opinion state that "because of the difficulty in verifying oral promises, the statements must clearly permit a construction which supports the asserted meaning."[60]

It is again relevant that the parties indisputably entered into a "contractual relationship." The only dispute concerns the enforceability of a single term of that relationship, the "as long as" dura-

_United Motor Stage Co, Inc_, 135 Ohio St 509, 512; 21 NE2d 669 (1939). (Emphasis added.)

[53] The Louisiana Court of Appeal found that a contract to provide "pest control and repair services with guarantees for the lifetime of the treated structure _so long as_ the customer paid a specified annual renewal fee" was for a "_definite and ascertainable period._" _State v Orkin Exterminating Co, Inc_, 528 So 2d 198, 199, 201 (La App, 1988). (Emphasis added.)

[54] RILEY, J., _ante_, p 644.

[55] _Id._

[56] _Id._, p 645.

[57] _Id._, p 643.

[58] _Id._, p 642.

[59] _Id._, p 643.

[60] _Id._, p 641.

tional term. Montgomery Ward did not seek to refute Rowe's and Harryman's testimony that the "as long as" term was agreed to.

Nor do the signers of the lead opinion cite authority for their view that words used to express oral contract terms must, more so than the words used in a written contract, "clearly permit a construction which supports the asserted meaning." The contract was oral in *Caplis*,[61] and in a number of the cases decided in other jurisdictions where the courts found that an "as long as" term provided a sufficiently definite durational term.[62]

In all events, this Court, in *Caplis,* held that an *oral* lease for " 'as long as I paid the rent' " and " 'until [the landlord] sold the property' " constituted a concise agreement "in plain terms of contingent but determinative duration. That is certain in law which can be made certain."[63]

To be sure, the formality of a writing may provide some additional assurance. In a case such as this, however, where there is no dispute concerning what was said, and where the words clearly would be sufficient to add an "as long as" durational term to the contract were it in writing, it cannot properly be said that the "as long as" term is not sufficient because it is oral.

Manifestly, if a collective bargaining agreement provided that the members of a labor union would be employed "as long as" John Engler is Governor, or MICHAEL F. CAVANAGH is Chief Justice, the durational term would be reasonably certain and the agreement enforceable.[64] Such a durational

---

[61] Discussed in part II-F, text preceding n 34.

[62] See ns 34-37, 44 and the accompanying text.

[63] *Caplis, supra,* pp 588, 590, 594.

[64] See *Don King Productions, Inc v Douglas,* 742 F Supp 741, 763 (SD NY, 1990). The contract provided that it should run for three years plus " 'the entire period [Douglas is] world champion and a

term would not be less certain or less enforceable if it were expressed orally.

## H

The emphasis in the concurring opinion on the absence of a durational term suggests recognition that where there is a durational term the employee ordinarily cannot be discharged during the duration of the contract except for cause.[65] To hold otherwise would vitiate an employment contract for "as long as the employee is able to do the work."

The concurring opinion asserts that "it does not follow that a promise to continue employment until cause existed for termination must be inferred" from an "*express* statement of job security," such as "for 'as long as I sold.' "[66] *Toussaint* contradicts this assertion.

Both of the contracts of employment considered in *Toussaint* were for "as long as" the employee did the job. *Toussaint* held that the trier of fact may find on the basis of an "as long as I do the job" promise of employment that the employment will continue until there is cause for termination.[67]

period of two years following the date on which [Douglas] thereafter cease[s] . . . to be so recognized as world champion.' "

The court held that the contract was of the type that provides for termination or cancellation upon the occurrence of a specified event, and that it was enforceable.

[65] Rowe does not claim that she could not be discharged for cause. She recognizes that, having signed the Rules of Personal Conduct, she could be discharged on a ground there stated. She also conceded that all the reasonable grounds for discharge under a contract providing termination only for cause need not be particularized.

An exception for cause would ordinarily be implied in fact for the benefit of the employer. There may, however, be a case where it would not be appropriate to infer an exception permitting the employer to discharge for cause other than that the employee is no longer able to do the work.

[66] BOYLE, J., *ante,* p 664.

[67] This Court there said:

Rowe's contract of employment was an "as long as I do the job" contract. Under *Toussaint,* the jury could properly be permitted to find that her contract was not terminable except for cause.

The author of the concurring opinion appears to acknowledge that "for 'as long as I sold' " is an "*express* statement of job security."[68] Nevertheless, it is asserted that "employment at will is the inferred term that the court supplies by construction" because "the parties have not supplied a durational term."[69] It is again relevant that "as long as I sold" supplies a durational term.

The "*express* statement of job security, for 'as long as I sold' " gave rise to an *express,* not an implied, contract of employment. Putting aside whether "as long as" constitutes a durational term, there is no suggestion in the cases discussed in part II-F[70] that a promisor would be permitted to terminate promissory obligations under an exclusive distribution, requirements, employment, or other "as long as" contract except for failure of performance by the promisee.

There is no suggestion in the cases there discussed that a term might properly be inferred permitting such a promisor to renege "at will," or that the promisee must, as a predicate of recovery, establish an implied promise not to renege "at

Both Toussaint and Ebling inquired regarding job security when they were hired. Toussaint testified that he was told he would be with the company "as long as I did my job." Ebling testified that he was told that if he was "doing the job" he would not be discharged. Toussaint's testimony, like Ebling's, *made submissible to the jury whether there was an agreement for a contract of employment terminable only for cause.* [*Toussaint, supra,* p 597. Emphasis added.]

[68] BOYLE, J., *ante,* p 664. (Emphasis in original.)
[69] *Id.*
[70] See n 34 ff, and the accompanying text.

will." On the contrary, if a renege-at-will term were implied, or a promise not to renege at will were a predicate of recovery, the plaintiffs in all the cases discussed in part II-F would have lost instead of prevailing.

"Contract law" becomes another oxymoron if a promisee must establish as a predicate to recovery that the promisor promised not to renege at will.

### III

The author of the concurring opinion finds persuasive the analysis of the lead opinion on "the threshold issue of *intent.*"[71] (Emphasis added.)

### A

The concurring opinion cites Professor Perritt's statement that an "informal promise" of employment security should not be "taken seriously by the law" unless the employee demonstrates that "*both* parties meant for their deal to be enforced."[72] The concurring opinion suggests that the lead opinion has adopted this position in stating that oral promises will be recognized where "cir-

---

[71] Drawing on the facts of *Toussaint* and *Ebling,* the lead opinion sets forth a list[4] of some of the circumstances that are of assistance in determining the threshold issue of intent.

---

[4] Among the circumstances identified as objective indications of intent are the clarity, specificity, and lack of ambiguity of oral statements; whether there were specific negotiations for job security; the nature of the position; and whether, if policy statements are relied on, they support or undercut a reasonable belief that a promise of job security was being extended.

---

[BOYLE, J., *ante,* pp 663-664.]

[72] Perritt, Employee Dismissal Law & Practice (2d ed), § 4.2, p 176. Professor Perritt's statement is discussed in part III-B.

cumstances suggest *both parties intended* to be bound."[73] (Emphasis added.)

The doctrinal thesis adopted by the majority appears to be that an employee seeking to enforce a contract of employment—in contrast with any other person who asserts that he entered into a contract with another person—has the burden of showing, with evidence other than the usual promissory "manifestations," that the employer *actually intended* to be bound.

The general rule, however, as stated by Professors Calamari and Perillo, is that "a party's intention will be held to be what a reasonable man in the position of the other party would conclude his manifestation to mean."[74]

Professor Farnsworth similarly wrote that the prevailing view is that the standard is objective and not subjective. The "promisee" is not required to show that the "promisor" made the promissory statement "with the intention of assenting to an agreement. It is enough that the *other party had reason to believe* that the first party had that intention."[75] Farnsworth, Contracts, § 3.6, p 114. (Emphasis added.)

---

[73] See BOYLE, J., *ante,* pp 665-666; RILEY, J., *ante,* p 636.

[74] Calamari & Perillo, Contracts (3d ed), § 2-2, p 27.

[75] Judge Jerome Frank . . . put it, "The objectivists transferred from the field of torts that stubborn anti-subjectivist 'the reasonable man.'" According to the objectivists, a party's mental assent was not necessary to make a contract. If his actions, judged by a standard of reasonableness, manifested an intention to agree, *the real but unexpressed state of his mind was irrelevant.* As an analyst from the field of torts might view it, that party had by his fault induced the other to believe that there was a contract.

By the end of the nineteenth century, the objective theory had become ascendant and courts generally accept it today. True, a party may still avoid liability by showing that he did not even intend to engage in the actions by which he appeared to manifest his assent, for example, if he was falsely told that a writing had no legal effect or was compelled to sign by such force that he was a "mere mechanical instrument." But as long as he intended to engage in those actions, *there is no further*

Professor Farnsworth continued:

> [T]he objective theory tends to hold the parties
> to linguistic usage that is accepted as normal, a
> matter of fact that arguably falls *within the prov-*
> *ince of a jury.*[76]

The signers of the lead opinion quote with approval from this Court's opinion in *Goldman v Century Ins Co,* 354 Mich 528, 535; 93 NW2d 240 (1958).[77] There, this Court adopted the objective standard for determining what constitutes a "meeting of the minds," and rejected the subjective approach.[78] Speaking through Justice TALBOT SMITH, the Court said:

> requirement that he must have done so with the intention of
> *assenting to an agreement. It is enough that the other party*
> *had reason to believe that the first party had that intention.*
> [Farnsworth, *supra,* pp 113-114. Emphasis added.]

[76] *Id.,* p 116. (Emphasis added.)

[77] Bernie and Leon Goldman conducted a coal business in Detroit. A fire damaged the coalyard bins, fences, and gates, and the roofs of out buildings in the coalyard, but there was no damage to the one-story or two-story buildings described in the fire insurance policies. The Goldman brothers insisted that they intended to insure everything flammable on the premises.

[78] Professors Calamari and Perillo summarized the debate concerning what constitutes a "meeting of the minds," and particularly concerning the differing approaches of the subjectivists and the objectivists:

> In the previous section it is stated that mutual assent is a prerequisite to the formation of the contract. However, over the years a debate has raged as to whether the assent of the parties should be *actual mental assent so that there is a "meeting of the minds"* or whether assent should be determined solely from *objective manifestations of intent*—namely what a party says and does rather than what he subjectively intends or believes or assumes. Thus under the objective theory the mental assent and intent of the parties is irrelevant. However, even under the objective theory the acts manifesting assent must be done either intentionally or negligently. *For at least a century the objective theory of contracts has been dominant.*
> Another portion of the credo of the objectivists is that objec-

We agree, also, that *evidence of the unexpressed thoughts and understanding* of the Goldmans was inadmissible to establish their intent. The Goldmans assert that such denial "shatters the whole concept of a 'meeting of the minds.'" They read the figure of speech too literally. To say, as we do, that a contract requires a "meeting of the minds" is only a figurative way of saying *there must be mutual assent. This we judge by an objective standard,* looking to the expressed words of the parties and their visible acts. [Emphasis added.]

The signers of the lead and concurring opinions appear to have adopted the subjective view, requiring evidence that "*both parties intended* to be bound,"[79] of "actual mental assent"[80] by the employer, to constitute a "meeting of the minds."[81]

tive manifestations of intent of the party should be viewed from the vantage point of a reasonable man in the position of the other party. The phrase "in the position of the other party" means that the other party is charged not only with the knowledge of a reasonable man but also with what he knows or should know because of his superior knowledge. . . . [*Id.*, § 2-2, p 26. Emphasis added.]

[79] RILEY, J., *ante,* p 636. (Emphasis added.)

[80] See Calamari & Perillo, n 78.

[81] In deciding whether there was *mutual assent* to a just-cause provision, we use an objective test, "looking to the expressed words of the parties *and their visible acts.*" [RILEY, J., *ante,* p 640. Emphasis added.]

In short, no objective evidence exists that their *minds met* on the subject of continued employment. [*Id.,* p 643. Emphasis added.]

Upon viewing the

surrounding circumstances of this case . . . to determine if there was *mutual assent* on a provision for permanent employment, or if the statements were noncontractual expressions of "optimistic hope of a long relationship," we find the oral statements insufficient to rise to the level of an agreement providing termination only for just cause. [*Id.,* p 643. Emphasis added.]

The lead and concurring opinions, in requiring "objective" indications or "validations,"[82] have in truth rejected, for oral contracts of employment, the general doctrine that "a party's intention will be held to be what a reasonable man in the position of the other party would conclude his manifestation to mean."

The majority, in effect, announces a new rule of law requiring corroboration or something akin, that an employer, acting through a subordinate such as Harryman,[83] actually intended to provide job security.

### B

The use of the quotations from Professor Perritt's treatise on Employee Dismissal Law and Practice in the concurring opinion is misleading.[84]

> [T]here is less chance that the parties desired or intended the result prayed for where, as here, conduct and oral statements are claimed to create a promise of job security implied in fact. [*Id.*, p 644. Emphasis added.]

> Consequently, we find no evidence from which reasonable minds could find that there was *mutual assent* on a term of employment terminable only for cause. [*Id.*, p 646. Emphasis added.]

[82] "[W]e find objective evidence lacking." *Id.*, p 643. "[N]o objective evidence exists." *Id.* "[O]bjective support for the oral representations." *Id.*, p 644. "[O]bjective support was lacking." *Id.*

But, as acknowledged in *Darlington v General Electric*, 350 Pa Super 183, 200; 504 A2d 306 (1986), quoted with approval in the concurring opinion, the " 'sufficient additional consideration' " validation device "may be nothing more than a legal fiction . . . ."

[83] Montgomery Ward did not assert or seek to establish, at trial or on appeal, that Harryman did not have authority to promise Rowe employment as long as she was able to sell, or to enter into a contract of employment with her on that basis.

[84] The statement first quoted, BOYLE, J., *ante,* p 663, that the " 'employment-at-will rule reflected a policy judgment' " is footnoted with a reference to §§ 4.12-4.17 of the same work. Section 4.12 contains the second statement quoted in the concurring opinion, *id.*, p 666.

When Professor Perritt states that there is little support in the cases for "forget[ting] about validation devices and [for] enforc[ing] employer promises of employment security merely upon proof that the employer made them," he is referring to Professor Fried's thesis that promises should be enforced on the basis of fairness without regard to whether there is consideration.[85]

If one reads on, it appears that "[t]he most common validation device is consideration: something given in return for a promise. This may be a return promise or it may be conduct. It may be any benefit or detriment that is given in exchange for a promise." Perritt, Employee Dismissal Law & Practice (2d ed), § 4.12, p 198. Read in context, it is manifest that Professor Perritt's statement does not support the notion that there must be an *actual* meeting of the minds.

Professor Perritt's true views become clear on reading the following:

> The doctrine of additional consideration sometimes has led to the *erroneous notion* that a promise of employment tenure must be supported by its own consideration, separate from consideration for other promises in the employment agreement.[86]

[85] See n 7 of Professor Perritt's work, pp 197-198, which is the sole citation in support of the second statement quoted in Justice BOYLE's opinion, p 666. "C. Fried, Contract as Promise 39 (1981) (enforcement of promises on the basis of fairness)."

[86] Perritt, *id.*, § 4.16, pp 207-208.
Professor Perritt continues:

> A majority view of contract doctrine is to the contrary:
> " 'A single and undivided consideration may be bargained for and given as the agreed equivalent of one promise or of two promises or of many promises.' *Thus there is no analytical reason why an employee's promise to render services, or his actual rendition of services over time, may not support an employer's promise both to pay a particular wage (for example) and to refrain from arbitrary dismissal.*"

Like the observations of Professor Perritt, Professor Epstein's remarks, in a law review article quoted in the concurring opinion, are directed at a question not here presented.

Professor Epstein's strictures are addressed to those who would impose by *operation of law*— statute or judicial decision—independently of the agreement of the parties, a just-cause term generally in employment relationships, with the result that, whether bargained for or not, employees would generally have tenure.[87] This Court rejected such an approach in *Valentine.*

Professor Epstein's views are clarified in reading the following passage, which the majority should

> Thus, it is important to recognize that the issue regarding consideration in an employment contract is whether the entire package of promises made by one party is supported by consideration. *Each discrete promise need not be supported by separate consideration.* [*Id.* Emphasis added.]

[87] This becomes clear if one reads in context the words quoted from Professor Epstein's article:

> The rule of construction is normally chosen because it reflects the dominant practice in a given class of cases and because that practice is itself regarded as making good sense for the standard transactions it governs. It is of course freely waivable by a joint expression of contrary intention. When the *law* introduces a just-cause requirement, it flies in the face of ordinary understandings and thus rests upon an assumption that just-cause arrangements are in the broad run of cases either more frequent or desirable than the contract at will, though neither is the case. Where this rule of construction is used, therefore, contracting-out will have to take place in the very large number of cases where the parties desire to conform to the norm by entering into a contract at will. Furthermore, it may be difficult to waive the for-cause requirement in fact, even if waiver is formally allowable as a matter of law, because of high standards for "informed" waiver that cannot be met after the fact. By degrees, the original presumption against the contract at will could so gain in strength that a requirement that is waivable in theory could easily become conclusive in fact. [Epstein, *In defense of the contract at will,* 51 U Chi L R 947, 951-952 (1984). Emphasis added.]

consider in assessing the issues presented in *Dumas.*

> The same problems can exist with modern employment contracts. Suppose that a worker has put in the effort to obtain for the firm a large contract on which he is to be paid a commission. If the firm dismisses him under an at-will contract before the sale is consummated and the commission is formally due, most courts will (rightly) imply a term of good faith that gives the employee the commission for the work done, unless the agreement explicitly provides otherwise. Thus in *Coleman v Graybar Electric Co, Inc* [195 F2d 374 (CA 5, 1952)], the plaintiff's claim for compensation rested in part upon commissions that were paid annually based upon the sales record in the previous period. The court construed the contract to preclude the at-will norm: "We conclude that in this case the contract did not authorize the forfeiture of additional compensation provided in the plan of compensation if the services of the employee were terminated arbitrarily and without just cause." [Epstein, *In defense of the contract at will,* 51 U Chi L R 947, 980 (1984).]

IV

Although the majority calls for "objective" evidence corroborating Montgomery Ward's actual intention to provide job security, it trivializes that search by focusing on inconsequential distinctions, urged by counsel for Montgomery Ward, said to distinguish the instant case from *Toussaint* but which, in another case, may be of little or no importance, because the record will show that the employee did not "stumble in," and did inquire about job security.

A

The signers of the lead opinion state that Rowe "did not engage in preemployment negotiations regarding security. She simply 'stumbled' into the store one day and had one interview before being hired. Nor is there any testimony suggesting that plaintiff inquired about job security."[88]

The analysis of the lead opinion suggests that if, instead of "stumbling" into the store one day, Rowe had answered a help-wanted advertisement Montgomery Ward was then running, or if she had "inquired" about job security, a different result might be justified.

The record, indeed, does not indicate how the subject of job security arose during the preemployment interview. But somehow or other the subject came up. When Harryman was asked whether he had informed Rowe of the "reasons for which she may be terminated," Harryman testified, "[t]heft or, you know, obviously, murder, or something like that; theft of any company properties, or so on." Also, Rowe signed the Rules of Personal Conduct, which enumerated grounds for discharge.

Since the record provides at least an issue properly submissible to the jury regarding whether Rowe and Harryman discussed job security, it should not be of any importance whether Rowe "inquired" about job security before Harryman brought it up and described the current policy as he understood it.[89]

B

Yet, even if Rowe had "inquired" about job

---

[88] RILEY, J., *ante,* p 643.

[89] The only record evidence concerning "company policy" was Harryman's testimony, tending to support Rowe's assertion that she was promised that she would have a job as long as she sold, "that's the way we used to hire our people."

security, that would not satisfy the majority. With still another analysis, the signers of the lead opinion observe that in *Toussaint, supra,* the plaintiff was applying for a "singular, executive job position[ ]," while Rowe "was one of many departmental salespersons." The lead opinion observes that Rowe's application was for one of "several identical positions" and reasons that this circumstance "militates against the likelihood that the contract terms were negotiable and suggests that company policy was more likely to govern."[90]

The record does not, however, indicate that there was a "company policy" contrary to Rowe's and Harryman's testimony. The Montgomery Ward manager who discharged Rowe testified that she would have had to rely, at the time she was hired, on what Harryman told her and what the Rules of Personal Conduct provided.

The lead opinion does not state or describe the "company policy" adverted to in the opinion. Thus, in addition to assessing, as trier of fact, the "*likelihood* that the contract terms were negotiable," and finding that "company policy was *more likely* to govern," the lead opinion appears to hypothesize or posit, without record support, an unstated and undescribed "company policy" that was neither consistent with Harryman's statements to Rowe nor reflected in the Rules of Personal Conduct.

C

The lead opinion states that "[u]nlike *Toussaint,* plaintiff did not engage in preemployment negotiations regarding security."[91]

*Toussaint* dealt with the consolidated appeals in

---

[90] RILEY, J., *ante,* p 643.

[91] *Id.*

Charles Toussaint's action against Blue Cross & Blue Shield of Michigan, and Walter Ebling's action against Masco Corporation. Both Toussaint and Ebling were employed in middle-management positions.

Ebling dealt directly with the executive vice president of Masco, and did indeed specifically "negotiate" for job security. The *Toussaint* opinion does not, however, indicate that Toussaint negotiated for job security any more than did Rowe.[92] An officer at BCBSM advised Toussaint of the current policy.

*Ebling* is distinguishable in this regard from *Rowe,* but *Toussaint* is not. Toussaint may have been a higher level employee than Rowe, but nothing in the *Toussaint* record suggests that the terms of Toussaint's employment with BCBSM were any more negotiable than the terms of Rowe's employment.

The effort to distinguish *Toussaint* on the basis of negotiations for job security does not bear analysis insofar as the case of Charles Toussaint is concerned.

V

The concurring opinion adverts to "the circumstances identified as objective indications of intent"[93] said to be set forth in the lead opinion. I fail to see how any of these criteria provide "objective indications" of an employer's actual intent to relinquish "managerial discretion" to discharge an employee at will. Be that as it may, the "circum-

---

[92] I acknowledge that the opinion in *Toussaint, supra,* p 612, states that Ebling and Toussaint "negotiated specifically regarding job security with the persons who interviewed and hired them." It would have been more precise to have said Ebling "negotiated" and Toussaint "inquired" about job security.

[93] BOYLE, J., *ante,* p 663, n 4.

stances identified as objective ʼindications of intent" tend—objectively or subjectively viewed—to support Rowe.[94]

## VI

The author of the concurring opinion postulates still another rule of construction:

> [W]hen considering whether a statement constitutes an offer, in the context of commercial contracts, courts construe a statement as nonpromis-

---

[94] *Clarity, specificity, and lack of ambiguity of oral statements.* The statement "as long as I sold, *I would have a job* at Montgomery Ward" is terse, but surely clear, specific, and unambiguous. As in *Caplis, supra,* p 594 (part II-F, preceding, n 34), the oral terms were "plain terms of contingent but determinative duration. That is certain *in law* which can be made certain." (Emphasis added.)

Harryman testified that he described what constituted "selling." He said that sales persons were generally expected to generate roughly $2,000 a week or more in sales. Clearly, the question what constituted "selling" was not left at large. The contract was clear, specific, and unambiguous insofar as what constituted "selling."

Nor was there ambiguity or an absence of clarity or specificity regarding the grounds for termination. In addition to Harryman's spelling out the work performance expected of Rowe—selling sufficient merchandise to make her weekly draw—the Rules of Personal Conduct provided that she would be immediately dismissed for "[t]heft, [de]struction or misappropriation of property, [v]iolation of accepted moral standards, [m]anipulating, altering or falsifying Company records (including employment application), or [d]ishonesty of any kind."

The terms of the contract of employment were, thus, clear and specific, and there was no ambiguity.

*Whether there were specific negotiations for job security.* While the record does not indicate whether it was Rowe or Harryman who brought up the question of job security, the question of job security was discussed and the subject of a writing, the Rules of Personal Conduct signed by Rowe.

*Whether, if policy statements are relied on, they support or undercut a reasonable belief that a promise of job security was being extended.* The Rules of Personal Conduct signed by Rowe spoke of "[g]rowth, [p]rofit, [s]ecurity," and "[s]uccessful career" (emphasis added) and stated that theft and other dishonesty could result in immediate dismissal. The Rules of Personal Conduct tended to reinforce the oral promise of job security.

sory if it would expose the maker to the risk of being bound to perform *beyond his means to perform*.[95] [Emphasis added.]

This suggests that providing job security for commissioned salespersons for as long as they sell might have been beyond the means of Montgomery Ward. There is nothing in the record to support such a finding, and under the circumstance that commissioned salespersons are paid only when they sell, it is unlikely that this rule of construction has any application on this record.

In this connection, especially noteworthy are the decisions of the Supreme Courts of Texas and California, and of the Louisiana Court of Appeal,[96] because in each of those cases the contracts—to provide water, pest control, or an exclusive selling agency—proved to be onerous during their long terms. The courts did not, however, relieve the contracting party of the "as long as" promise. Again, however, there is nothing to suggest that employing Rowe, on a straight commission basis, as long as she sold might be economically disadvantageous to Montgomery Ward.

## VII

The "issue" dealt with in part II of the lead opinion was not briefed or argued by Rowe, and hence cannot properly be decided at this time.

This issue is addressed in two cases pending in this Court on applications by *employers* for leave to appeal, *Henry v Montgomery Ward,* Docket No. 90134, and *Schippers v SPX Corp,* Docket No. 90702.

---

[95] Boyle, J., *ante,* p 667.

[96] See ns 50, 45, and 53.

A

The first paragraph of part II of the lead opinion reads:

> Having concluded that the employer's oral statements and the "Rules of Personal Conduct" did not form contracts for permanent employment, we must next decide whether the disciplinary guidelines promulgated by defendant gave rise to an employment contract providing termination only for just cause where defendant concurrently issued sign-off sheets containing an employment-at-will policy. *We find that plaintiff cannot maintain an action for breach of contract on the basis of the disciplinary guidelines because the last handbook which plaintiff received clearly set forth an employment-at-will policy.*[97] [Emphasis added.]

The *"last handbook"* was issued in 1983.

While Rowe argued that the Rules of Personal Conduct, which she signed in August, 1976, when she was hired, were *part of her express* contract of employment and gave rise to reasonable expectations of termination only for cause, she did not assert that the procedure set forth in the 1983 manual or handbook—the sign-off sheet which she did not sign—gave rise to an *implied promise* of termination only for cause. Rowe did not assert that she could, in the words of the lead opinion, *"maintain an action for breach of contract on the basis of the disciplinary guidelines"* set forth in the 1983 handbook.

B

Rowe's brief did not claim rights under the 1983

---

[97] RILEY, J., *ante,* p 646.

manual or handbook,[98] but rather that it was *not* binding on her.[99] During oral argument, Rowe

---

[98] While Rowe's brief did not claim rights under the 1983 manual or handbook, she did assert that the 1982 handbook provided a separate basis for her "objective expectancy that she would not be terminated except for cause":

> It is Plaintiff's contention that the 1982 handbook is a reiteration of the "for cause" policy first established by Mr. Harryman's statement and the 1976 personal rules of conduct. This means that there are three separate bases for Ms. Rowe's objective expectancy that she would not be terminated except for cause, i.e., the oral statements, the 1976 Personal Rules of Conduct (Exhibit 2), and the 1982 handbook (Exhibit 10).

The mere assertion that the 1982 handbook provided one of three separate bases for Rowe's "objective expectancy" without any supporting argument or advocacy whatsoever did not raise the issue dealt with in part II, and does not provide an appropriate basis for a pronouncement by this Court on an issue pending in a separate application for leave to appeal in this Court where there is adversary briefing.

The court rules require that a brief contain a "statement of questions involved . . . ." MCR 7.212(C); MCR 7.306(A). Neither Rowe's application for leave to appeal nor her brief on appeal in this Court stated as a question presented for review (MCR 7.302[A][1][b]) or involved whether the jury's verdict in her favor could be sustained solely on the basis of the 1982 handbook.

It is well established that this Court will not ordinarily review questions not separately stated in the statement of the questions presented for review or where leave to appeal has been granted in the statement of questions involved. See 7A Callaghan's Michigan Pleading & Practice (2d ed), § 57.24, p 305.

[99] Plaintiff readily admits that Defendant published new handbooks in 1983. She denies that it was intended that she be bound by the new employment terms specifically addressed to "new employees." The jury was shown the 1983 handbook and defendant argued that the "at will" language contained therein was to apply to all employees, including Plaintiff. The Court of Appeals in *Langeland v Bronson Methodist Hosp,* 178 Mich App 612; 444 NW2d 146 [1989], lv den 433 Mich [915] (1989), addressed the issue of conflicting language in a policy manual. In *Langeland, supra,* the manual contained both "at-will" and "just cause" language. The Court, citing *Dalton v Herbruck Egg Sales Corp,* 164 Mich App 543; 417 NW2d 496 (1987) stated that a jury question exists when the stated termination policies of an employer contain expressions of both "at-will" and "just cause" employment.

While Rowe did refer to Court of Appeals decisions, *Langeland* and

stated her position that as a result of both the oral assurances creating the express-contract leg under *Toussaint,* and as a result of Rules of Personal Conduct, in light of this Court's ruling in *Toussaint* and subsequent cases, a question was raised sufficient for presentation of the jury. The reference to the Rules of Personal Conduct, of course, adverts to the Rules of Personal Conduct signed in 1976, and not the 1982 or 1983 manuals or handbooks.

It appears from the Court of Appeals opinions on this issue, in *Langeland v Bronson Methodist Hosp,* 178 Mich App 612; 444 NW2d 146 (1989), *Dalton v Herbruck Egg Sales Corp,* 164 Mich App 543; 417 NW2d 496 (1987), *Henry, supra,* and *Schippers, supra,* that the issue is not free from doubt.[100]

C

In *Keasey v Engles,* 259 Mich 178, 181; 242 NW 878 (1932), this Court said:

*Dalton,* that address the issue dealt with in part II of the lead opinion, it is clear from the foregoing that Rowe was not seeking to predicate a right of recovery on the basis of the 1983 manual or handbook, but rather stated an alternative reason for finding that the 1983 manual or handbook did *not* apply to her.

Rowe's brief also asserted that, assuming the "at-will" language in the 1983 handbook applied to her, which she denied, Montgomery Ward did not provide her with reasonable notice of its "attempted unilateral change to an 'at-will' policy." This argument was prompted by this Court's decision in *In re Certified Question, Bankey v Storer Broadcasting Co,* 432 Mich 438; 443 NW2d 112 (1989), decided after the decision by the Court of Appeals in the instant case.

Rowe observed that in *Certified Question,* this Court said that " 'reasonable notice of the change must be uniformly given to the affected employees.' " It is apparent that Rowe was concerned that this Court might extend the concept set forth in *Certified Question,* permitting unilateral change of a policy manual, to a unilateral change of an express contract.

[100] See *Preston v Claridge Hotel & Casino,* 231 NJ Super 81; 555 A2d 12 (1989), where, on the facts, the court found a disclaimer in a revised employee handbook to be ineffective. See also *McDonald v Mobil Coal Producing, Inc,* 789 P2d 866 (Wyo, 1990).

Plaintiff relies upon an expression in *Carmichael v Carmichael,* 72 Mich 76 [40 NW 173 (1888)], to the effect that beneficiaries under contract to make a will were proper parties plaintiff, "as parties having vested interest in this real estate under the contract of their father and mother." The question of vesting *was not raised in the case,* and the expression cannot be given the force of authority thereon. [Emphasis added.][101]

CAVANAGH, C.J. (*dissenting*). I am in substantial agreement with the analysis of my Brother LEVIN's dissenting opinion, with the exception of parts II(E) and VII, *ante,* pp 693-694, 715-719. Justice LEVIN persuasively demonstrates why the majority's analysis is simply erroneous with regard to the law, and constitutes a virtual overruling of *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579; 292 NW2d 880 (1980). I add only the following observations:

First, my Brother LEVIN, in part IV(C), *ante,* pp 712-713, demonstrates why the majority's reliance on the fact that Rowe did not specifically "negotiate" for job security, see *ante,* pp 641-642, fails

---

[101] In *Hett v Duffy,* 346 Mich 456, 461-462; 78 NW2d 284 (1956), this Court said:

It is true that the *plaintiff* has not raised the question here and has not cross-appealed. Under the circumstances, anything this Court might now say on the question of law as to presumption of due care would not be controlling of decision. On the contrary, our conclusion here that plaintiff's decedent was guilty of contributory negligence as a matter of law controls the outcome, and *any discussion of the issue of presumption of due care would merely be obiter dicta.*

"Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand, are, however illuminating, but *obiter dicta* and lack the force of an adjudication." *People v Case* (syllabus), 220 Mich 379 [190 NW 289 (1922)].

See, also, *Robinson v Gordon Oil Co,* 266 Mich 65, 71 [253 NW 218 (1934)]. [Emphasis added.]

adequately to distinguish this case from *Toussaint.*
I would go further, however, and point out that
the majority fails to convincingly explain why
"negotiation" or the lack of it is even relevant.
The relevant issue regarding the terms of Rowe's
oral employment contract—including the dura-
tional or job security term, if any—is *what* terms
were in fact agreed to, not *how* or *whether* they
were "negotiated." The majority's reasoning sug-
gests that a company is legally incapable of offer-
ing an oral just-cause employment contract to a
prospective employee on a standardized, "take-it-
or-leave-it" basis. Yet offering such contractual job
security as a matter of standard routine, even
without "negotiation" or prompting or inquiry
from the applicant, would seem to be an attractive
"selling point" for any company seeking employ-
ees, and would seem likely to aid the company in
finding and keeping good employees. The majori-
ty's reasoning, carried to its logical limit, would
permit companies to reap the benefits of offering
such contractual job security, without holding
them to their promises. This is neither fair nor
countenanced by any accepted contract principles.

Second, my Brother Levin demonstrates that
the majority confuses the issue whether Rowe's
claim is supported by express contractual state-
ments with the separate issue whether her claim
is supported by the employer's written policy state-
ments, see *ante,* pp 678-682 (part i[b]), and that, to
the extent "objective support" for the express oral
contract in this case is relevant, such factors sup-
port Rowe, see *ante,* pp 713-714 (part v). I agree
and would point out that the majority's newly
invented requirement of "objective support" for
such an express oral contract from policy manuals
or statements, see *ante,* p 644, plainly alters and
misapplies this Court's holding and reasoning in

*Toussaint* and its companion case, *Ebling.* While it is true, as the majority notes, that "Toussaint was given a manual specifically providing termination only for just cause," *ante,* p 644, we did not rely on the policy manual in *Toussaint* to support the existence of Toussaint's oral just-cause contract. The policy manual was relevant only to Toussaint's *separate* claim that his dismissal without cause was barred by "legitimate expectations" created by the manual. See 408 Mich 598-599 (holding that "[i]n *Toussaint,* as in *Ebling,* there was sufficient evidence of an express agreement to justify submission to the jury," and *separately* holding that "[a] jury could *also* find for Toussaint based on legitimate expectations grounded in his employer's written policy statements") (emphasis added). The majority ignores the fact that in *Ebling* there was no policy manual providing any "objective support," but only oral statements establishing an oral just-cause contract. See *id.* at 625-626 (opinion of RYAN, J., joined by COLEMAN, C.J., and FITZGERALD, J.). Yet this Court, while dividing four to three in Toussaint's favor, held *unanimously* that Ebling had produced sufficient evidence of an oral just-cause contract "to justify submission to the jury." *Id.* at 598 (opinion of the Court), and at 633-636 (opinion of RYAN, J., joined by COLEMAN, C.J., and FITZGERALD, J.).

Finally, I would note that the majority in this case, despite its disclaimers, effectively takes upon itself the role of jury and factfinder. See, generally, *ante,* pp 640-646. The majority makes quite clear that, were it sitting as the jury in this case, it would not be convinced that a just-cause contract of employment was entered into. It is well established, however, by a fifty-year-old line of controlling precedents (unbroken until now) that whether two parties have, by express oral statements, en-

tered into a contract providing for just-cause employment is, ultimately, a question of fact for the jury. See *McIntyre v Smith-Bridgman & Co,* 301 Mich 629, 637; 4 NW2d 36 (1942); *Toussaint,* 408 Mich 613 (opinion of the Court), and at 635 (opinion of RYAN, J., joined by COLEMAN, C.J., and FITZGERALD, J.); *Bullock v Automobile Club of Michigan,* 432 Mich 472, 484-485; 444 NW2d 114 (1989). It is equally well established that the jury's determination of factual issues should not be disturbed unless, considering the record in the light most favorable to the verdict, there is *no* competent or sufficient evidence from which reasonable minds could reach the jury's conclusion. See *Kupkowski v Avis Ford, Inc,* 395 Mich 155, 167-168; 235 NW2d 324 (1975); *Dodd v Secretary of State,* 390 Mich 606, 612; 213 NW2d 109 (1973).

The majority has not demonstrated how the oral just-cause employment contract in this case—which clearly enjoys sufficient factual support to justify the jury's verdict—is barred or precluded by any supervening principles of contract law, properly analyzed. This case, for all relevant and dispositive purposes, is legally and factually indistinguishable from *Toussaint.* I therefore dissent from the majority's overturning of the jury's verdict.

MALLETT, J., took no part in the decision of this case.